**MAINE POTATO GROWERS, INC., Petitioner,**

v.

**Earl L. BUTZ, Secretary of Agriculture and the United States, Respondents.**

**No. 75–1445.**

United States Court of Appeals, First Circuit.

Argued April 5, 1976.

Decided July 30, 1976.

**520**

Joseph B. Goldman, Washington, D. C., with whom Morison, Murphy, Abrams & Haddock, Washington, D. C., was on brief for petitioner.

Michael Kimmel, Atty., Dept. of Justice, Civil Div., Appellate Section, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Civil Div., Appellate Section, Washington, D. C., were on brief for respondents.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

Maine Potato Growers, Inc. petitions this court for review of the Secretary of Agriculture's (Secretary) decision to suspend its license to trade perishable agricultural commodities. The Judicial Officer of the Department of Agriculture found that petitioner had, during the crop years 1969–1972, committed fourteen separate violations of § 2(5) of the Perishable Agricultural Commodities Act (the Act), 7 U.S.C. § 499b(5). Finding no mitigating circumstances, the Judicial Officer, pursuant to § 8(a) of the Act, 7 U.S.C. § 499h(a), ordered a 60 day suspension of petitioner's license. Maine Potato Growers now attacks that order on the grounds (1) that six of the fourteen violations were not supported by substantial evidence, (2) that the 60 day suspension

was inappropriate because of the circumstances of the violations and the alleged availability of equally effective, but less burdensome, sanctions, and (3) that the suspension order constituted an unlawful attempt to compel shipping point inspections.

Petitioner is a northern Maine farmer cooperative with approximately 600 members. One of the many services it offers its members is a marketing outlet for the potatoes they grow. Petitioner, who trades primarily in "U.S. No. 1" grade potatoes, supplies the farmer members with bags bearing the designation, "U.S. No. 1" and the name "Maine Potato Growers, Inc." The farmers load the potatoes on the carriers, and petitioner takes title to them immediately after they are loaded. Although petitioner is listed as the shipper, the potatoes are in fact shipped by the farmers from one of 800 to 1000 different farmers' loading facilities. During the crop years in question, there were 10,516 such shipments.

As a potato dealer, petitioner is subject to the duties created by the Act[1] and is required, under § 3(a), 7 U.S.C. § 499c(a), to have a license issued by the Secretary. Petitioner's license was issued in December, 1938. The Act's licensing requirement is one of the primary means of securing its objective of preventing unfair practices in the marketing of fresh fruits and vegetables. Section 2 of that Act declares certain conduct unlawful, and § 8(a) authorizes the Secretary to suspend, and in some cases to revoke, the license of any dealer who is found to have violated any provision of § 2. The suspension power and its exercise serve the dual purposes of deterring violations of § 2 by all licensees and of enabling the Secretary to punish licensees who in fact violate its provisions.

Section 2(5) of the Act makes it unlawful for any licensee to misrepresent the character, kind, or grade of any perishable agricultural commodity that is shipped or sold in interstate commerce. Potatoes, like all

---

1. Although petitioner does not actually ship its potatoes, it is clear, and is conceded, that petitioner, as a potato dealer with title to the pota-

toes, is responsible for the shipments under the terms of the Act.

other fresh fruits and vegetables, are classified into various grades under regulations and standards issued by the Secretary pursuant to § 203(c) of the Agricultural Marketing Act (AMA), 7 U.S.C. § 1622(c). "U.S. Grade No. 1" potatoes are defined in terms of size, shape, and freedom from certain external and internal defects. *See* 7 C.F.R. § 51.1541. The regulations do not require that every potato in a given lot conform to the Secretary's standards; small percentage deviations are allowed. *See* 7 C.F.R. § 51.1546. The tolerance levels, of course, are not the dealer's goal or objective; they are the maximum permissible limits for the specified defects.

The Secretary's primary means of investigating possible violations of § 2(5) of the Act are inspections, which are conducted, almost always at the buyer's request, at the point of destination. These, and other inspections are authorized by both § 14(a) of the Act and by § 203(h) of the AMA. Section 14(a) further provides that "official inspection certificates" for fresh fruits and vegetables shall be received by all officers and courts of the United States as prima facie evidence of the truth of the statements contained therein. The inspection services which the Secretary is permitted to offer may be employed by the shipper prior to the time of the shipment to ensure that the shipment has been properly labeled under the federal grading standards. When a shipper uses this service and receives a favorable determination, it is the Secretary's policy to treat the shipper as immune from § 8(a) sanctions if the shipment subsequently is determined to have been misbranded at the time of shipment. Although requiring any dealer who uses a federal grade

label to receive a shipping point inspection might be conceived of as an appropriate means of implementing the objectives of § 2(5) of the Act, Congress apparently has prohibited the imposition of such a requirement. Section 203(h) of the AMA provides that "no person shall be required to use the [inspection] service authorized by this subsection." We assume, but need not decide, that this prohibition applies equally to inspection services authorized by § 14(a) of the Act at issue here.

During the crop years 1969 to 1972, there were fourteen separate occasions where a buyer of petitioner's potatoes requested an official inspection of a shipment marked "U.S. No. 1" and where the inspection certificate that was issued read that the portion of the shipment that was inspected failed to meet the federal requirements for that grade or was otherwise mislabeled. Most of petitioner's violations were greatly in excess of the permissible tolerances.[2] Following each incident, the Secretary advised petitioner of the misgrading and requested an explanation, which petitioner in each case attempted to supply. In 1970 and 1971 petitioner's replies ranged from stating that the grower, unaccountably, had elected not to have inspection and that the misgrading had not been intentional, to averring that petitioner had taken no part in the grading or loading. In addition, on May 3, 1971, the Department sent petitioner a letter pointing out the violations that had occurred since early 1970, emphasizing the seriousness of the violations, and suggesting that petitioner either "have official inspection covering future shipments of potatoes packed in sacks marked 'U.S. No. 1' or omit grade markings on such sacks if unable to

2. In eleven of petitioner's shipments, the inspector found that petitioner had, often by substantial margin, exceeded the tolerances for "external grade defects". Before September 1, 1971, when the tolerance for such defects was 6%, petitioner's shipments had average external grade defects of 8%, 13%, 10%, 9%, and 14%. After September 1, 1971, when the tolerance for external defects was 5%, petitioner's shipments had average external defects of 10%, 12%, 8%, 7%, 12%, and 7%. The three other shipments involved different types of vio-

lations of the Secretary's regulations. The first was found to have average internal and external defects totalling 11% when the tolerance for total defects was 8%, and the second had average internal defects of 9% when the tolerance for such defects was 5%. The final violation arose because petitioner's shipment averaged 48.25 pounds per bag, but was represented to have a net weight of 50 pounds per bag. The average weight of the bags reflected almost twice the 2% tolerance of shrinkage (weight loss) allowed by the Department.

obtain such inspection." Petitioner replied that it would urge that growers use official inspection, that it would discontinue serving offending growers, that it would cut down the volume it handled from questionable loaders, that it would use non-U.S. grade labels on shipments of doubtful quality, and that it would convey the seriousness of the problem to both its own directors and its farmer members.

While there had been three violations in 1970, and two in 1971, there were nine in the half year following the 1972 harvest, the crop apparently having been made vulnerable by early cold weather. The petitioner made various replies to the Secretary's requests for an explanation: that the misgrading was unintentional, that the suppliers' graders had been negligent, and that full instructions would be given. Finally, after the last violation, in May, 1973, the Department filed the complaint, which culminated in the order we review today. Although the complaint alleged 18 violations of § 2(5), the Secretary withdrew two of these charges, and two were dismissed. The Judicial Officer found violations in the fourteen other incidents, relying largely upon the official inspection certificates which were introduced, and it ordered a 60 day suspension.

I

Petitioner's first major argument is that six of the fourteen violations the Judicial Officer found were not supported by substantial evidence since six of the inspection certificates, which were introduced into evidence and apparently treated as prima facie evidence of the truth of the statements contained therein, did not show the signature of the inspector. Both parties assume that the record does not contain substantial evidence supporting these six violations if § 14(a) of the Act precluded the Judicial Officer from treating the six unsigned documents as "official inspection certificates", that presumptively established the violations which were found.

To set forth why we do not accept petitioner's contention that a document must show the inspector's signature to qualify as an "official inspection certificate" within the meaning of § 14(a), it will be helpful if we describe both the Secretary's internal procedure in issuing inspection certificates and the procedural background of this case. Following each official inspection, the Secretary requires the inspectors to prepare a federal inspection certificate—consisting of an original and six copies. The inspectors are instructed to sign the original, but not the carbons, see General Market Inspection Instructions, Consumer and Marketing Service, U. S. Department of Agriculture, ¶ 217, p. 58; to deliver the original to the buyer who requested the inspection; and to distribute carbon copies to various offices of the Secretary of Agriculture. See 7 C.F.R. §§ 46.40, 51.21(a). At the administrative hearing, counsel for the Department introduced into evidence one of the retained copies of each of the inspection certificates, after having all such copies identified as copies of official inspection certificates from the official files of the Secretary. Although six copies did not bear the signature of the inspector, petitioner's counsel stated that he had no objection to the admission of the copies, and petitioner did not attempt to attack the genuineness or regularity of the certificates by exercising its right to question the inspector. See 7 C.F.R. § 47.34. However, in its post-hearing briefs, petitioner argued that the six unsigned inspection certificates were "of no probative value" because they lacked the inspector's signature. The Judicial Officer rejected this argument.

The sole question before us is whether the Judicial Officer erred in interpreting § 14(a) as permitting unsigned documents to qualify as "official inspection certificates" for purposes of that section's statutory presumption. By failing to object or otherwise attempt to challenge the authenticity of these six documents, petitioner waived any objection to their genuineness. See Opp Cotton Mills v. Administrator, 312 U.S. 126, 155, 61 S.Ct. 524, 85 L.Ed. 624 (1941). We are satisfied that the Judicial Officer's interpretation of § 14(a) was a

permissible one. There is nothing in § 14(a) which in any way indicates that a document must contain a signature to qualify under its terms, and we can conceive of no substantial policy which would be advanced by requiring that signatures appear on an official copy of an inspection certificate. Indeed, since the Secretary requires that the inspectors sign only the original, the administrative practice is such that the adoption of petitioner's view would seemingly defeat the purposes of § 14(a); in instances in which the inspectors' signature did not appear on the copy, the Secretary otherwise would presumably have to produce the inspector to testify in the not unlikely event that he could not procure the original from the buyer.

It should be clear the the Judicial Officer's interpretation imposed no substantial hardship on petitioner and that it will not unduly prejudice the interests of any licensee in a § 8(a) proceeding. Before a document may be introduced into evidence as "an official inspection certificate", the Department's counsel will have to lay an adequate foundation for its admission. And even then, whether or not the document is signed, a licensee is free to subpoena the inspector and/or introduce evidence tending to establish either that the certificate was not genuine or that the statements contained therein are false. See 7 C.F.R. § 47.-34. Since the Judicial Officer's construction of § 14(a) places no undue burden on licensees and since it is entirely consistent with the apparent policies of that section, we hold that he did not err in giving the six unsigned documents presumptive effect pursuant to § 14(a) of the Act.

II

Petitioner's second major contention is that the 60 day license suspension order was invalid because (1) it was too harsh under the circumstances, (2) more appropriate, available sanctions were not considered by the Judicial Officer, and (3) it constituted an unlawful attempt to require official inspections at the shipping points. Petitioner presents the sympathetic picture of a highly reputable organization, responsible annually for 2000 shipments of potatoes from over 800 shipping points, found to have committed a relatively small number of violations—most of which arose following the poor harvest of 1972—and now facing a marketing suspension which will hurt all its members, most of whom have always complied with the federal grading standards. We are sensitive to the rigor of the sanction, but we do not sit as a court of first impression. Our task is not to judge those regulated; rather, it is to judge the regulator—under a very narrow standard of review. See J. Acevedo & Sons v. United States, 524 F.2d 977, 979 (5th Cir. 1975).

When exercising judicial review over a suspension order, we must act in accordance with the "fundamental principle, however, that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy 'the relation of remedy to policy is peculiarly a matter for administrative competence.'" American Power Co. v. SEC, 329 U.S. 90, 112, 67 S.Ct. 133, 146, 99 L.Ed. 103 (1946). We may not set aside the Secretary's choice of sanction unless we find it "unwarranted in law or . . . without justification in fact . . . ." Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973), and cases cited.

Here the 60 day suspension was plainly not unwarranted in law. Section 8(a) authorizes the Secretary to order suspensions of up to 90 days whenever he determines that a licensee has violated § 2 of the Act. Although a license suspension is a harsh sanction, Congress clearly contemplated that it could be imposed in cases in which the violations had not been found to be intentional or fraudulent. See Harrisburg Daily Market, Inc. v. Freeman, 114 U.S.App.D.C. 26, 309 F.2d 646 (1962); cf. Butz v. Glover, supra 411 U.S. at 187, 93 S.Ct. 1455. Here, moreover, as in Glover, we think the breadth of the grant of authority to impose the sanction "strongly implies a congressional purpose to permit

the Secretary to impose it to deter repeated violations of the Act." 411 U.S. at 187, 93 S.Ct. at 1458; *cf. Pangburn v. CAB,* 311 F.2d 349, 354 (1st Cir. 1962); *Hyatt v. United States,* 276 F.2d 308, 313 (10th Cir. 1960).

■ Nor is there any basis in this record for a conclusion that the suspension order was so " 'without justification in fact' 'as to constitute an abuse of [the Secretary's] discretion.' " *Butz v. Glover, supra* 411 U.S. at 188, 93 S.Ct. at 1459 *quoting American Power Co. v. SEC, supra* 329 U.S. at 115, 67 S.Ct. 133. Petitioner was found guilty of fourteen violations of § 2(5), almost all of which were substantial. Given the clear statutory authority for the suspension and the apparent Congressional purpose of deterring similar patterns of illegal conduct, the suspension order was sufficiently justified in fact.[3]

■ Petitioner lists a number of what it characterizes as "mitigating factors" and urges that, under the circumstances, the suspension order was so harsh as to constitute an abuse of discretion. First, it notes that it has an excellent reputation in trade circles, that it had taken detailed measures to comply with § 2(5), and that the order will harm innocent farmer members by requiring them to locate alternative marketing outlets during the period of the suspension. Although the Secretary could permissibly have given weight to these factors, we think it clear that their presence cannot preclude a 60 day suspension.

■ Second, petitioner maintains that it has an excellent compliance record since only fourteen of its 10,516 shipments during this four year period were affirmatively found to violate § 2(5). This statistic, however, is a meaningless one since there is no indication in the record as to the percentage of petitioner's shipments which were actually inspected. But even if it were affirma-

tively shown that only a very small percentage of petitioner's shipments were in violation of § 2(5), we strongly doubt that the Secretary's power to order a 60 day suspension would have been affected. Under the Act, petitioner was under an absolute duty to ensure that the potatoes it ships under the federal grade "U.S. No. 1" do in fact comply with the federal grading standards. Petitioner appears to suggest that the Secretary is somehow obligated to tolerate petitioner's fourteen substantial violations of § 2(5). The short answer to petitioner's suggestion is that the tolerances specified in the federal grading standards are the maximum permissible deviations; no additional tolerances are authorized by either other Departmental regulations or by § 2(5) or § 8(a) of the Act.

■ Finally, petitioner notes that most of the fourteen violations occurred during the 1972 crop year when, due to the weather conditions at harvest time, the potatoes were exceedingly difficult to bring into grade. Although, again, the Secretary could permissibly have considered this fact in determining the proper remedy, it was not an abuse of discretion for the Secretary to issue his order despite this factor. The difficulty of bringing a crop into grade plainly does not excuse violations of the duty imposed by § 2(5). The alternative, implicit in petitioner's argument, is that standards should not be enforced in poor crop years.

Although the foregoing discussion is determinative of the validity per se of the suspension order under the Act, we must discuss petitioner's further objection that more appropriate sanctions were available but were not considered. After petitioner received its evidentiary hearing before the administrative law judge but before any findings had been made, Congress amended

---

3. There plainly is nothing unique about the suspension order that was entered in this case. Similar orders have been entered under the Act and similar statutes. *See, e. g., J. Acevedo & Sons v. United States,* 524 F.2d 977 (5th Cir. 1975) (70 day suspension under the Act); *Miller v. Butz,* 498 F.2d 1088 (5th Cir. 1974) (21

day suspension under the Packers and Stockyards Act); *Martin v. United States,* 459 F.2d 300 (6th Cir. 1972) (6 months disqualification under the Food Stamp Act); *Kent v. Hardin,* 425 F.2d 1346 (5th Cir. 1970) (90 day suspension under the Commodity Exchange Act).

§ 2(5) of the Act and added the following language:

"Provided, That any commission merchant, dealer, or broker who has violated this subsection may, with the consent of the Secretary, admit the violation or violations and pay a monetary penalty not to exceed $2,000 in lieu of a formal proceeding for the suspension or revocation of a license, . . . ."

In the further proceedings before the Judicial Officer, petitioner urged that he should consider imposing a monetary fine as an alternative to a suspension order. The Judicial Officer refused to consider that alternative sanction, holding that he had not been delegated the power to impose a monetary fine. He did, however, take somewhat extraordinary albeit appropriate steps, to ensure that the administrative officials with the authority to accept a fine could give consideration to this option and accord petitioner the benefit of the amendment to § 2.[4] Petitioner now contends that the Judicial Officer was in error in concluding that it lacked the authority to impose monetary fines.

Although the language and legislative history of the amendment to § 2(5) possibly suggests that it was never intended to benefit licensees with petitioner's record of noncompliance, and although the interpretation of § 2(5) that petitioner urged upon the Judicial Officer may have been other-

wise erroneous,[5] we need not address either of these questions. The sole issue before us is whether the Judicial Officer erred in refusing to consider imposing a fine as an alternative to a suspension order.

The Judicial Officer is empowered to act for the Secretary within narrowly defined parameters only. Pursuant to 7 U.S.C. §§ 450c–450g, the Secretary has authorized the Judicial Officer to perform "any regulatory function . . . which the Secretary of Agriculture is or hereafter may be authorized or required by law to perform, in acting as final deciding officer in adjudication proceedings . . . ." Regulatory functions which do not involve the Secretary in this capacity are either delegated to other administrative officials or remain the province of the Secretary.

We are satisfied that the Judicial Officer did not err in concluding, on the basis of his interpretation of the amendment to § 2(5) of the Act, that the regulatory function of accepting fines from licensees who had allegedly violated that section was not one which the Secretary is to perform in adjudicatory proceedings. The amendment plainly contemplates that monetary fines would be imposed as the result of off the record settlement negotiations between the Secretary's enforcement officials and the licensee. The provision that such fines are to be "in lieu of" suspension proceedings seemingly admits of no other

4. Initially, we were concerned that, because of the timing of the amendment to § 2(5), petitioner might have been foreclosed from any opportunity for exploration of the monetary penalties alternative. Because of the Judicial Officer's efforts, however, the record discloses that petitioner did receive sufficient consideration by the administrative officials.

At oral argument, the Judicial Officer urged the administrative officials with the power to settle for monetary penalties to negotiate with petitioner and emphasized that they were entirely free to do so at any time before his order became final. The Judicial Officer's written opinion reiterated these points. After Maine Potato Growers filed a petition for rehearing on April 30, 1975, moreover, the Judicial Officer announced in a June 24, 1975 order, that decision on that motion would be delayed "in order to afford [Maine Potato Growers] an opportuni-

ty to communicate with the Department's officials who have the authority to determine whether a monetary penalty should be accepted in lieu of a fine." The Judicial Officer ultimately denied the petition on September 30, 1975, "[Maine Potato Growers having been] unsuccessful in its efforts to convince [the administrative officials] to accept a monetary penalty . . . ." Under the circumstances, the Judicial Officer was not obligated to take further steps to ensure consideration of monetary penalties by the administrative officials.

5. The legislative history suggests that monetary fines were intended to be an option only for licensees who committed two or three violations. *See* S.Rep.No.93–1036, 93d Cong. 2d Sess. (1974). Petitioner, contrary to the express provisions of the amendment to § 2(5), made the further argument that fines could be imposed only for "proven violations".

interpretation.[6] In upholding the Judicial Officer, however, we wish to emphasize that we hold only that the present allocation of the Secretary's regulatory powers is permissible and that we in no way wish to suggest that the Secretary could not vest the Judicial Officer with the power to enter into settlements for monetary fines.

Petitioner's final objection to the 60 day suspension order is that it constitutes an attempt to circumvent § 203(h) of the AMA and to impose a requirement of compulsory federal inspection at shipping point. The premise of petitioner's argument is that under the Secretary's enforcement policy the only way it could have avoided the imposition of the suspension order would have been to use federal shipping point inspections. It maintains that, regardless of the extent of its efforts to comply with federal grading standards, it was inevitable that petitioner would occasionally ship potatoes that would subsequently be found to fail to comply with federal grading standards. Since it is the Secretary's policy to treat a certain number of violations of § 2 of the Act as grounds for suspension and since shipping point inspections immunize the shipper from a suspension order, it contends that the only way to avoid suspension is to use the federal inspection service at the shipping point.

The Judicial Officer implicitly rejected petitioner's assertion that the "only way" it could have avoided the suspension orders would have been to use the federal inspection service. Petitioner clearly had at least one alternative. In instances in which it had any doubts about the adequacy of its quality control measures to bring a shipment into grade, petitioner always had, as it admitted in one of its letters to the Secretary, the option of placing a lower grade marking on the shipment. Although doing so might, in some cases, have resulted in shipping, at a lower grade, potatoes which would have passed inspection as "U.S. No. 1", the adoption of this general practice would have protected petitioner from a suspension order. We fail to see how petitioner has even a colorable claim that it is being "require[d]" to use official inspection services at the shipping point.[7] What petitioner's argument implies is that if certain measures short of federal inspection prove unavailing, there is a right to ship mislabeled products.

We recognize that petitioner's members might be worse off economically if they were to adopt a practice of omitting the "U.S. No. 1" grade marking in all doubtful cases and of substituting a lower grade designation in its place. Since petitioner has no interest whatsoever in shipping mis-

---

**6.** Petitioner suggests that the Judicial Officer's construction of § 2(5) presents a due process problem because, under it, the decision to accept a fine is made off the record and the Judicial Officer never has an opportunity to consider the appropriateness of the "lesser sanction" of a fine. We see no due process problem. There is nothing unique in an arrangement in which prosecuting officials may settle a case and impose a sanction not available to the Judicial Officer; judicial tribunals are not infrequently more limited in their choice of sanctions than enforcement personnel. Nor can there be any objection based upon the fact that the Judicial Officer does not explicitly consider the propriety of a monetary fine. His determination, which of course is subject to judicial review, that a suspension order is appropriate necessarily implies that a "lesser sanction" would not be.

**7.** Petitioner also suggests that the order is invalid because the Secretary's attempts to induce petitioner to comply with the Act indicate

that its "real motivation" was to compel petitioner to use federal shipping point inspections. Assuming, *arguendo*, that such a purpose would vitiate the otherwise lawful suspension order, *compare Continental Air Lines v. CAB*, 522 F.2d 107 (D.C.Cir. 1974), we see no persuasive evidence that the Secretary's motivation was as petitioner alleges. We agree with the Judicial Officer that the record discloses that the Secretary's primary, if not sole, interest has been to have petitioner achieve compliance with the duties imposed by the Act. The Secretary exhibited great patience with the petitioner. He notified it after each violation, suggested alternative means of achieving compliance after the sixth violation, and waited until fourteen substantial violations had occurred before instituting suspension proceedings. The fact that the Secretary, at one point, suggested that petitioner use shipping point inspections is of very little significance since the Secretary also suggested the alternative of omitting the "U.S. No. 1" designation.

labeled potatoes, whatever economic sacrifice is involved is a necessary incident to the performance of its statutory obligations. Because of the possible economic consequences of this alternative, there may, of course, be some economic pressure on licensees, who have difficulty complying with § 2 of the Act, to arrange instead for federal shipping point inspections. As is implicit in the foregoing discussion, we think it plain that § 203(h)'s prohibition of "require[d federal inspections]" does not preclude the Secretary from enforcing the Act in such a way that licensees feel some pressure to use federal inspections services at shipping points. *Cf. Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236–37 (8th Cir. 1975).

*The petition for review is denied.*