**BANGOR AND AROOSTOOK RAIL-
ROAD COMPANY, Petitioner,**

v.

**INTERSTATE COMMERCE
COMMISSION,
Respondent,**

**Maine Central Railroad Company et
al., Intervenors.**

No. 77–1082.

United States Court of Appeals,
First Circuit.

May 12, 1978.

Laurence S. Fordham, Boston, Mass.,
with whom Verne W. Vance, Jr., David W.
Walker and Foley, Hoag & Eliot, Boston,

* Of the Fifth Circuit, sitting by designation.

Mass., were on petition for rehearing or, in
the alternative, rehearing·en banc.

Before CAMPBELL, Circuit Judge, TUT-
TLE, Circuit Judge,* WOLLENBERG, Dis-
trict Judge.**

MEMORANDUM AND ORDER

Bangor and Aroostook Railroad Company
("BAR") has petitioned for rehearing
and/or, rehearing en banc, on the question
whether the statute of limitations bars re-
covery of damages incurred by Maine Cen-
tral Railroad ("MEC") and by the trustees
of Boston and Maine Corp. ("B&M") prior
to July 8, 1972. The statute of limitations
question was addressed and decided against
BAR in our opinion. BAR now claims an
inconsistency between our treatment of the
issue there and in this court's recent opinion
in *Cook v. Avien*, 573 F.2d 685 (1 Cir. 1978).

In *Cook* the purchasers of stock sued a
broker and the issuing company for fraudu-
lent omissions during the course of the sale.
We held that plaintiffs had failed to carry
their burden of proving reasonable dili-
gence in investigating and pursuing their
claims once they were on notice that their
investments were rapidly deteriorating.
We held them barred by the one-year stat-
ute from recovery under §§ 12(1) and (2) of
the Securities Act of 1933. We remanded
on the question of whether the applicable
two-year limitations period similarly pre-
vented recovery under § 10(b) of the Securi-
ties Exchange Act as this necessitated a
more precise factual inquiry than was ap-
propriate at the appellate level.

In seeking rehearing in the case at bar,
BAR maintains that there was

"uncontradicted proof that at least as of
September 18, 1970 complainants had ac-
tual knowledge of (1) their 'sudden adver-
sity' through a 'decline in traffic shipped
over their lines' (Opinion at 37); (2) 'the
intensified sales effort' by CP and BAR

** Of the Northern District of California, sitting
by designation.

(Opinion at 8 and 37); [1] (3) the existence of an agreement between BAR and CP that called for some form of additional payments by CP to BAR for additional BAR connecting traffic moving via BAR (Ex. 67–68, 73); and (4) the purpose of the BAR–CP activities 'to foster elimination of Maine Central from all possible routings' (Ex. 73)—knew, in fact, of all the material elements of the violation of section 3(4) that the Commission and this Court have found in this case."

BAR argues that our holding that the statute was tolled in these circumstances conflicts with the ruling in *Cook* that the statute was not tolled "when 'storm warnings' had given the potential plaintiffs 'inquiry' notice . . . that they must diligently investigate what lay behind the warnings."

While the argument is by no means frivolous we think the different rulings in the two cases were justified by different factual and legal considerations. We start by pointing out that the evidence, in its totality, is not so conclusive of MEC's "actual knowledge" as BAR would have it. The evidence is equally indicative of MEC's holding mere suspicions about BAR–CP activity, fired by rumor and BAR's waffling in the face of pointed interrogation by MEC—suspicions held despite BAR and CP's concurrent obfuscation of their plan.

For example, MEC President Miller's memorandum of a conversation he had with Dumaine on July 2, 1970, shows that Dumaine described BAR's "reported arrangement" with CP variously as a result of shipper preference and concomitant BAR revenue interests, a need for better service on its connecting lines, and alleged difficult working relations between BAR and MEC personnel. Dumaine also said the alleged contract had not yet been finalized, that it was still being worked on, that he had never seen a final draft. Dumaine "further indicated, in view of what [Miller] said, that

there was some doubt if the Montreal agreement would ever be finalized." Dumaine did disclose to Miller, when pushed, the general terms of at least one version of the proposed arrangement. (He expressed the financial agreement between BAR and CP in different ways at different points in the conversation.) But Dumaine did not respond to Miller's request to see the agreement, and put Miller off generally with regard to the agreement's status and future, *i. e.*, whether it would be put into effect. Yet by this time, July 2, an agreement in principle had been reached, and the solicitation efforts of both BAR and CP had begun.

This evasive approach typified BAR's response to MEC's other inquiries. As we noted in the opinion, early in 1970 the president of BAR wrote the president of MEC that

"[i]t has never been the policy of this company to solicit routings from the Great Northern Paper Company or other customers, and we have no intention of changing that policy."

This was written when negotiations between BAR and CP were already in progress.

Requests by MEC that BAR or CP disclose the arrangement went unheeded by BAR. Though there was testimony that in June, 1970, before Miller's interview with Dumaine, BAR apprised MEC of the existence of an arrangement yet to be executed, subsequent inquiry of CP officials elicited the responses that CP "was performing a sales blitz in Aroostook County, which is necessary"—implicitly on its own initiative, and that "there was no division agreement in the works," but "probably there would be a per diem agreement." Miller's statement, in his letter of September, 1970, to Great Northern, evinces MEC's awareness that "it is no secret that Mr. Dumaine entered into a little hanky-panky with the Canadian Pacific whereby [BAR] and [CP] agreed to use

---

1. We actually said, Opinion at 8, that "MEC became generally aware of the intensified promotion campaign on CP's behalf," and, at 37, that "the carriers' investigation uncovered the intensified sales effort by CP, and, possibly, by BAR."

their best efforts to foster elimination of [MEC] from all possible routings," but at the same time it sets forth again, albeit skeptically, BAR's disingenuous responses that car supply and service considerations motivated and warranted the arrangements. Further, in March, 1972, a BAR vice-president wrote to the B&M Chief Executive Officer that the "overriding factors which contribute towards the decision to use CPR are service and car supply," and requested that the B&M official not divulge the Brownville Junction traffic data to MEC. The BAR officer later conceded that he did not mention the contract when discussing changing traffic patterns in the letter to B&M because of BAR "sensitivity" about the agreement with CP.[2]

Evasive and misleading responses of this sort by the defendants were not a factor in *Cook*. The *Cook* investors made feeble inquiry of those who had defrauded them on a single occasion over six months after serious financial reverses. were manifest. It was not contended that they were then misled or lulled. In the case at bar, MEC made diligent inquiry. Although it unearthed some knowledge, it could be found to have been impeded by BAR's evasions from arriving at a full appreciation of the true scope and character of BAR's plan until disclosure of the agreement in 1972.[3] We do not sympathize with BAR when it argues that MEC should be charged with knowledge notwithstanding BAR's deliberate concealment.

Other factors also differentiate this case from *Cook*. First, the cause of action under § 3(4) was little known and infrequently used by carriers against each other, and its contours were ill-defined, making it less reasonable to expect MEC and B&M to have ascertained from the incomplete evidence available in 1970 that they had a cause of action under § 3(4). In *Cook*, by contrast, the Securities Act and Securities Exchange Act provided well defined vehicles for relief from alleged securities fraud. Second, and related to the foregoing, the scope and firmness of the BAR-CP commitment, and its underlying reasons, were tied into the availability of § 3(4) relief. Given the relative complexity of a § 3(4) action, it was not enough for MEC simply to suspect some degree of "hanky-panky" and collusion. As we pointed out in the opinion at n. 18,

> "While BAR vigorously maintains that its solicitations were legal, it simultaneously urges that MEC and B&M should have known enough to sue at the first inkling that BAR was soliciting on behalf of CP. Now, with voluminous detail before us, it seems apparent that the activities of BAR were well within the prohibition of § 3(4). But it is easily conceivable that the violation would not have been evident to a competing carrier privy only to bits and pieces of information about that activity. Furthermore, while the Commission did not regard the agreement as itself violative of § 3(4), no other piece of evidence revealed so dramatically the scope and purpose of BAR's actions."

Third, the policies at work in applying the securities acts are distinct from those to be considered in implementing the Interstate Commerce Act. The large number of investors, the scope of § 10(b) protection and its broad potential for violation, and the rapid changes in market conditions that create the desire for a hedge, all enhance the need for firm enforcement of the statute of limitations in cases such as *Cook*. We pointed this out in *Cook*, at 698 (diligence required so that the securities acts not "be used as

---

2. MEC points out additionally that BAR failed to report its agreement with CP in its annual report to the Commission for 1970. The report form, at section 531, requires:

"a concise statement of each important contract, agreement, arrangement, etc., with other companies or persons, . . . which became effective during the year, and concerned in any way the transportation of persons or things at other than tariff rates . . . includ[ing] joint facility arrangements."

This agreement, which projected diversion of 24,000 carloads over the course of the year, falls easily within the category of contracts to be disclosed.

3. For example, disclosure of the agreement informed MEC of the ostensibly 15 year long commitment, the 24,000 car per year diversion target, the rebate mechanism, and the absence of service factors or contingencies, which all bore on the lawfulness of BAR's plan.

havens for speculation and a buffer against any investment loss.") In this transportation case, by contrast, longer-lasting institutional arrangements which may be slow to reveal themselves provide the focus; the parties are interdependent institutions for whom to incur the antagonism of shippers and sister carriers by bringing suit before all the facts are known is a risk-laden venture; and the ICC investigation here embodied the evolution of a broad-based policy consistent with the language and spirit of § 3(4), but not, without the entire picture, an obvious statutory violation. (BAR notes MEC's early awareness of the agreement's possible illegality only in an anti-trust context.) We are here, moreover, reviewing a decision by an administrative agency concerning a statute entrusted to its authority. The equities involved in the tolling of the period of limitations are entwined with the policy considerations of the Interstate Commerce Act. Considerable deference is owed to the agency's perception of the equities in such a case.

We conclude therefore that the decision in this case constituted a fair application of the doctrine of equitable tolling as developed in the cases, including in *Cook v. Avien*.

*The petition for rehearing is denied.*