574 F.2d 1096
 BANGOR AND AROOSTOOK RAILROAD COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
Maine Central Railroad Company et al., Intervenors.
MAINE CENTRAL RAILROAD COMPANY, Petitioner,
v.
UNITED STATES of America, and Interstate Commerce
Commission, Respondents,
Bangor and Aroostook Railroad Company, Intervenor.
Robert W. MESERVE and Benjamin H. Lacy, Trustees of the
Property of Boston and Maine Corporation, Debtor,
Petitioners,
v.
UNITED STATES of America, and Interstate Commerce
Commission, Respondents.
 Nos. 77-1082, 77-1105 and 77-1108.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 12, 1977.
Decided March 30, 1978.
Rehearing Denied No. 77-1082 May 12, 1978.
See 578 F.2d 444.
 
 Laurence S. Fordham, Boston, Mass., with whom Verne W. Vance, Jr., Scott C. Moriearty, Boston, Mass., Todd D. Rakoff, Foley, Hoag & Eliot, Boston, Mass., William M. Houston, Edward T. Robinson, and Gaston, Snow & Ely Bartlett, Boston, Mass., were on briefs, for Bangor and Aroostook Railroad Co.
 Peter J. Nickles and Eugene D. Gulland, Washington, D. C., with whom Covington & Burling, Washington, D. C., and Scott W. Scully, Portland, Me., were on briefs, for Maine Central Railroad Co.
 Sidney Weinberg, Boston, Mass., for Robert W. Meserve and Benjamin H. Lacy, Trustees of the Property of Boston and Maine Corp., Debtor.
 Lee A. Monroe and Sidley & Austin, Washington, D. C., on brief for intervenor Canadian Pacific Limited.
 Charles H. White, Jr., Associate Gen. Counsel, Washington, D. C., with whom Mark L. Evans, Gen. Counsel, John H. Shenefield, Acting Asst. Atty. Gen., Carl D. Lawson, Daniel J. Conway, Attys., Dept. of Justice, and Raymond Michael Ripple, Atty., Washington, D. C., were on briefs, for I. C. C. and the United States.
 Before CAMPBELL, Circuit Judge, TUTTLE, Circuit Judge,* and WOLLENBERG, District Judge.**
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 These are consolidated petitions to review cease and desist orders and damage awards entered by the Interstate Commerce Commission in a report and order of February 4, 1977. 28 U.S.C. §§ 2321, 2342, 2344. The Commission's actions followed administrative proceedings concerning the legality of interchange arrangements between the Bangor and Aroostook Railroad Co. (BAR) and Canadian Pacific Ltd. (CP). Initiated in 1973 by the Commission itself, the proceedings focused upon complaints which Maine Central Railroad (MEC) and the Boston and Maine Corporation (B&M) filed in 1974 seeking damages on account of BAR's purportedly unlawful preference of CP.
 
 
 2
 In agreement with an administrative law judge, the Commission concluded that BAR, "aided" by CP, had "unduly prejudiced Maine Central Railroad Co. and Boston and Maine Corporation . . . in the distribution of traffic in violation of section 3(4) of the Interstate Commerce Act (the Act)," 49 U.S.C. § 3(4).[1]
 
 
 3
 Acting under authority of § 16(1) of the Act, 49 U.S.C. § 16(1), the Commission held BAR liable in damages to the two complaining carriers. But the Commission's assessment of the amount of damages was considerably lower than the ALJ's. It ordered BAR to pay damages of $176,323 to MEC and $86,917 to B& M, with 4% Interest.[2]
 
 
 4
 BAR here challenges the Commission's ruling that it was guilty of conduct violative of § 3(4). It also challenges the Commission's awarding damages to MEC and B&M and the amounts assessed. In separate petitions, MEC and B&M also contest the amount of damages, claiming that the ALJ's higher assessments should have been adopted.
 
 
 5
 We conclude that the Commission had ample basis to find that BAR violated § 3(4) and that its conduct damaged MEC and B&M. We also sustain the Commission's determination of damages. However, since we find the cease and desist orders to be overly broad, we vacate those orders and remand that aspect of the case for clarification.
 
 
 6
 * At the heart of BAR's allegedly improper conduct is a formal agreement that BAR and CP concluded in July, 1970, initiating a shipper solicitation program in an attempt to divert "as much traffic as possible" from MEC and B&M[3] onto BAR's alternative connecting line, CP. The facts we state are drawn from the opinions of the ALJ and the Commission. Except as noted, they are substantially undisputed.
 
 
 7
 BAR's track network spans 541 miles in Maine. It connects with CP at Brownville Junction, located 45.3 miles north of Northern Maine Junction, where BAR interchanges with MEC. MEC connects further on with B&M.[4] These four railroads skirt and cross the Canadian border in the northeastern reaches of Maine, offering alternative through routes for shippers with goods to be transported across the region. Paper, frozen vegetables, starch, clay, and wood pulp, primarily, are shipped over these lines. Depending on a shipper's origination and destination points, he may have the option of routing his traffic via BAR and CP, or via BAR with MEC and B&M.[5] BAR is primarily an originating carrier, receiving goods directly from shippers rather than from other railroads, and shipping them out toward destinations not reached by its lines.
 
 
 8
 In October of 1969, the Amoskeag Co., a company controlled by a "voluntary association" known as Dumaines, purchased 99 percent of BAR stock. Frederic C. Dumaine, who controls Dumaines, became a director and chief executive officer of BAR after the purchase. When this purchase was made, Amoskeag owned 26 percent of MEC stock as well; the Commission found that "word of an impending merger between MEC and BAR became widespread" after the acquisition. In early November, 1969, the president of BAR (who had stayed on at the request of Dumaine) asked that BAR's general freight manager prepare a traffic study showing which of the cars presently traveling via Northern Maine Junction could instead be interchanged at Brownville Junction, without modifying their destinations. A series of memos on this subject followed; most were passed on to Dumaine by the president of BAR, in late November and early December of 1969. The memos detailed the commodities and numbers of carloads that were subject to such a diversion; one set forth the estimated loss, about $2.8 million per year, that was predicted to accrue to MEC and B&M should all 24,000 such carloads successfully be rerouted. Another memo, circulated in mid-December, compared transit times for goods traveling the alternative routes, and showed little over-all difference between the two routes.
 
 
 9
 Negotiations between CP and BAR to arrange a cooperative effort in support of a freight diversion plan were initiated late in 1969, and continued through the first half of 1970. Salient features of the negotiations were BAR's undertaking to furnish CP origin and destination statistics of all traffic subject to diversion, CP's duty aggressively to solicit new traffic, and CP's agreement to expand and improve its interchange facilities at Brownville Junction in order to handle the expected additional traffic. CP also indicated by letter its understanding that any agreement regarding concerted solicitation efforts that was ultimately concluded would be "long-term and not subject to any reversal of policy" by BAR.
 
 
 10
 In mid-January, BAR investigated the potential financial impact on BAR of the proposed re-routing efforts: it compared the divisions that it would receive from additional traffic of different commodities when shipped over CP instead of over MEC. The investigation showed that diversion would decrease BAR's revenues in some cases and induced CP to offer to pay BAR a "car allowance" for every additional car moving over its lines that would otherwise give BAR a diminished division.
 
 
 11
 After further discussion and correspondence, the terms of an agreement were reached in early June of 1970, and activity pursuant to that agreement intensified.[6] Under the heading "PRIVATE " a written confirmation of the agreement set forth inter alia that BAR had,
 
 
 12
 "agree(d) to interline with CP Rail via Brownville Junction as many cars of paper products and potatoes as it is possible for it so to interline and anticipates that by reason of this agreement such interline traffic will be increased by approximately 24,000 cars annually as follows:
 
 
 13
 The agreement described the allowances that CP agreed to pay BAR on additional carloads of potatoes and paper products that would be interlined at Brownville Junction; those payments were to be made "quarterly by check through the Claims Section of the Auditor of Freight Claims". CP also formally undertook to improve its interchange facilities. Not specifically spelled out in the memorandum, but apparent from the correspondence and testimony regarding the negotiations of early 1970, was the commitment of both parties vigorously to solicit traffic on behalf of CP. The pact was to bind the parties over a fifteen year period; there was provision, however, for reopening and renegotiation every five years, on 180-day notice. The agreement was not formally executed until July 31, 1970, but it was by its terms to take effect retroactively, as of January 1, 1970.
 
 
 14
 The Commission received evidence that pursuant to this agreement, both carriers approached shippers, urging them to route their traffic over CP instead of via MEC. Though service differences such as transit time, reliability, and car supply were sometimes cited to the shippers in support of the solicitations, those comparisons do not appear to have been grounded in either fact or prior study.[7] BAR also "distributed suggested routes to the principal shippers on its lines. . . . All suggested routes were via Brownville Junction." CP and BAR personnel made some solicitation visits jointly, in search of more traffic for CP.
 
 
 15
 The sales efforts of BAR and CP coincided with a drop in traffic shipment over MEC that was marked enough to prompt MEC's inquiry of shippers and carriers about the possible reasons behind the decrease. As MEC became generally aware of the intensified promotion campaign on CP's behalf, MEC engaged in some counter-solicitation in an attempt to stem the tide, and evidently had some success. BAR's and CP's efforts continued in varying intensity over five years, until the agreement was terminated at CP's request on February 18, 1975, retroactive to January 1, 1975.
 
 II Liability under § 3(4)
 
 16
 Section 3(4) of the Act, entitled "Interchange of traffic", provides,
 
 
 17
 "All carriers subject to the provisions of this chapter shall, according to their respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and connecting lines, and for the receiving, forwarding, and delivering of passengers or property to and from connecting lines; and shall not discriminate in their rates, fares, and charges between connecting lines, or unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper. As used in this paragraph the term 'connecting line' means the connecting line of any carrier subject to the provisions of this chapter or any common carrier by water subject to chapter 12 of this title." (Emphasis supplied.)
 
 
 18
 49 U.S.C. § 3(4). In a rate discrimination case brought under the section, the Supreme Court has commented generally, "In the absence of any settled construction of § 3(4), . . . its manifest purpose to deprive railroads of discretion to apportion economic advantage among competitors at a common interchange must be the basic guide to decision." Western Pacific Ry. Co. v. United States, 382 U.S. 237, 244, 86 S.Ct. 338, 343, 15 L.Ed.2d 294 (1965).
 
 
 19
 The Supreme Court has not had occasion expressly to construe the language in § 3(4) barring "undue prejudice" in the distribution of traffic. However, a three-judge court in Southern Pacific Ry. v. United States, 277 F.Supp. 671 (D.Neb.1967), aff'd mem., 390 U.S. 744, 88 S.Ct. 1442, 20 L.Ed.2d 275 (1968), has interpreted this part of § 3(4) to prohibit a carrier from soliciting traffic preferentially, in favor of one connecting line over another:
 
 
 20
 "The prohibition of Section 3(4) is against discriminatory conduct of the carrier against connecting lines. The Act cannot be circumvented by wrongfully inducing the shipper to commit the discrimination in place of the carrier. In other words, the legislation is not to be so weakly construed that it permits the carrier to accomplish indirectly what he cannot do by direct preferential routing. In view of the clear policy expressed by the statute, we see no meaningful distinction between arbitrarily soliciting the unrouted freight at that time and arbitrarily routing it should the shipper leave it unrouted. . . . '(T)here is no basis for the contention that Congress intended to exempt any discriminatory action or practice of interstate carriers affecting interstate commerce which it had authority to reach.'
 
 
 21
 ". . . . arr
 
 
 22
 ". . . (W)e feel that preferential solicitation when done on a 'preconcerted' and 'systematic' discriminatory basis, . . . falls within the statutory prohibition of Section 3(4) as well (as preferential routing). The preferential solicitation dictated by the agreement is without concern for competitive benefits of similar lines and without relationship to the best possible service to the shipper. It is as much an apportionment of 'economic advantage' as direct routing itself."
 
 
 23
 277 F.Supp. at 685, quoting Houston, East & West Texas R. Co. v. United States, 234 U.S. 342, 356, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), and Western Pacific Ry., supra. It is to be noted that the judgment in Southern Pacific was summarily affirmed by the Supreme Court, although summary affirmance on statutory questions such as were there presented does not inevitably conclude future interpretations of § 3(4). Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam); Fusari v. Steinberg, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975) (Burger, C. J., concurring).7A
 
 
 24
 We accept the district court's interpretation in Southern Pacific, and the Commission's similar construction in this case.[8] Section 3(4) addresses the "interchange of traffic." The proscribed act is "unduly prejudic(ing) a connecting line in the distribution of traffic." A defense is provided carriers who route traffic "specifically routed by the shipper," New York v. United States, 568 F.2d 887, 894 n. 12 (2d Cir. 1977); this is consistent with other provisions of the Act that protect shippers' freedom. The other subsections within § 3(4) all speak to a carrier's obligation to afford even-handed treatment to its connecting lines, except room is allowed for different treatment when warranted by so-called "service considerations." The provision seems obviously meant to avert the anti-competitive effects of a powerful or well-positioned carrier using its influence and position in favor of one connecting line over another, and thus skewing the market as that market is structured under the Act.
 
 
 25
 Especially in light of Southern Pacific, we think the language of the statute put BAR fairly on notice that its conduct was prohibited.[9] BAR, primarily an originating carrier, waged a broad-gauged and long-term solicitation campaign in support of only one of its connecting lines, CP. There is substantial evidence supporting the Commission's finding that the sales effort was initiated, and continued, not on the basis of any markedly superior service (i. e. "service considerations") that CP furnished its shippers, but rather for some other motive. The evidence indicated that in the study of comparative transit times undertaken prior to BAR's broaching the possibility of joint solicitation with CP, no one carrier demonstrated a distinct advantage. Until after the negotiations had begun, BAR attempted no assessment of the reliability of alternative carriers, nor even of BAR's own divisions in the rates of commodities shipped over the two available routes. An examination of the latter subsequently revealed that BAR itself would lose revenues on potatoes and paper products should those goods be interlined with CP rather than with MEC, causing CP to agree to pay BAR so-called "car allowances" for diverted traffic. The facilities of CP did not dictate that it would be in every shipper's interest to ship via CP: CP had to expand and upgrade its interchange facilities with BAR as part of the agreement to solicit the divertible traffic.
 
 
 26
 Further, BAR points in its brief to no specific instances where BAR's recommendations to shippers were individually tailored according to service considerations. BAR's solicitation efforts were uniformly on behalf of CP. Its undertaking was to solicit "all traffic possible" for CP, not just traffic that CP could, objectively, handle better than others. The agreement BAR entered into with CP committed it to seek traffic on behalf of CP over a fifteen-year period, without provision for release in less than five years. Should CP's service have deteriorated, BAR remained obliged to solicit on its behalf. The agreement was a secret one; the "car allowances" CP was to pay BAR appear to have been concealed as freight claim payments. BAR favored CP by providing it with a detailed list of shippers and commodities originating on BAR lines; BAR distributed no such lists to other carriers as a matter of policy. This cannot conceivably constituted even-handed treatment in the distribution of traffic.
 
 
 27
 Post hoc characterization of these activities as salutary promotion of competition through fair-minded recommendations to strong and sophisticated shippers is implausible. Though the Commission made no express finding that these solicitations were fraudulent or coercive, nor that competition, as distinct from competitors, was injured by the campaign, its findings did not reveal the impartial approach toward connecting lines in the distribution of traffic that is required of an originating carrier by § 3(4).
 
 
 28
 We therefore have little hesitancy in upholding the Commission on the facts of this case. In so doing, we go no further than to support a ruling that active and deliberate solicitation by an originating carrier for one or more of its connecting lines, to the plain neglect and detriment of other connecting lines, violates § 3(4) of the Act, when such solicitation is not supported by a significant service differential between those carriers (or any other specific exception grounded in the Act)[10] that objectively could justify a departure from impartial treatment.
 
 
 29
 While this construction of § 3(4) seems clear enough, BAR disagrees, and has launched a multi-faceted attack on both the Commission's interpretation and application of the section. First, with CP, it urges that the traffic that it solicited was "specifically routed by the shipper," in that it arrived at BAR's loading platforms, for example, with routing instructions signed by the shipper. BAR argues that it merely followed the shippers' instructions when it routed the solicited traffic via CP. Moreover, BAR claims to have been prohibited by § 3(4) from rerouting that traffic in derogation of the shippers' wishes. BAR relies correlatively on sections 15(10), 15(11), and 15(12) of the Act, 49 U.S.C. §§ 15(10), 15(11), 15(12), as exemplifying Congress' intention to protect "unfettered shipper choice," and submits that to construe § 3(4) as prohibiting BAR from routing in accordance with shippers' instructions would "make a mockery" of § 15(10), and conflict with the purposes of the Act.
 
 
 30
 We find no merit in this argument. Section 3(4), while consistent with the subsections of § 15, does not blindly deify "shipper choice." Its focus is inter-carrier relations. The shipper choice that BAR relies on in its defense was tainted by BAR and CP's solicitation efforts, which were not founded upon the shippers' service interests, and provides no satisfactory justification of the systematic favor BAR bestowed on CP.
 
 
 31
 BAR objects that no inquiry was made into whether the prejudice suffered by MEC and B&M was "undue." It contends that "undue" prejudice refers to injury incurred as a result of harm to competition, drawing an analogy to antitrust law. But while the Commission has characterized the statute as "pro-competitive", that characterization does not thrust § 3(4)'s construction into the thick of antitrust doctrine. BAR's analogy asks too much. Undue prejudice may refer to a disadvantage to a connecting line that is unwarranted by service considerations. Such harm to connecting lines as may result from a carrier's breach of the strictures of § 3(4) are recoverable in damages under the terms of the Act without an independent assessment of the state of "competition" in the market, and the Commission is empowered to make such an award. 49 U.S.C. §§ 8, 13(1), 16(1).[11] And as the Commission noted, it is "inapposite for BAR and CP to maintain that the BAR-CP agreement promoted competition when a normal competitive situation presupposes that each connecting line has equal advantage and opportunity to solicit shippers."
 
 
 32
 BAR further urges that its soliciting activities and agreement with CP were not shown to have "distributed traffic." It says that it would be illogical to conclude that the ultimate routing instructions given by the shippers on each of the thousands of shipments reflected BAR's choice rather than the shipper's choice. But while it might be possible for a minor connecting carrier to maintain that its solicitations on behalf of another connecting line did not carry enough weight to amount to "distribution", an originating carrier such as BAR, controlling many miles of track by which shippers gained railway access to various destination points, could reasonably be found to command a position from which it exerts substantial influence over shippers' choice of routes, regardless of a shipper's experience or sophistication.[12] This is not to say that an originating carrier necessarily controls its shippers it may depend on them collectively as much as they on the carrier nor that a carrier could sanction noncooperative shippers by simply refusing them service other sections of the Act limit a carrier's power in dealing with shippers; but a shipper might well feel compelled to cooperate with an originating carrier rather than incur its disfavor. Further, BAR and CP instituted and carried out a systematic program of solicitation, pursuant to agreement, rather than sporadically asking for business in a few instances. We see no reason not to characterize this as an effort to " distribut(e) traffic" in contravention of § 3(4).
 
 
 33
 Last, BAR asserts that the Commission's reading of the statute conflicts with the first amendment of the United States Constitution. This contention was not raised before the agency, but even assuming it is now open we see no merit in it. Though first amendment protection has lately been afforded some types of commercial speech, see Bates v. State Bar, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (attorney advertising); Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (residential "for sale" signs); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (advertising of drug prices), the first amendment has not yet been held to limit regulation in areas of extensive economic supervision, such as the securities, antitrust, and transportation fields, where the exchange of information can be a vital element in an illegal scheme. Shaping the regulation of "speech" in those areas is more a matter of policy development than one of constitutional right; it lies most appropriately with Congress and the regulatory agency. Even if some language in the above-cited cases may have seemed to herald a new era of first amendment law, see Virginia State Board of Pharmacy, supra, 425 U.S. at 762, 96 S.Ct. 1817, the revolution has yet to envelop the transportation field to the extent BAR asserts.
 
 
 34
 Moreover, unlike the statutes questioned in the cases cited by BAR, the challenged construction of § 3(4) does not dictate silence on the part of carriers. It does not prevent an originating carrier from providing information of any and all sorts to shippers on an even-handed basis. It does require that an originating carrier make good faith efforts to ascertain the accuracy of purported "information," and it limits the pressure that an originating carrier may put on a shipper. Without demonstrable superiority of a connecting line, an originating carrier, in its influential position, is precluded from sponsoring that line. Cf. Bates v. State Bar, supra, 433 U.S. at 4904, 97 S.Ct. 2691. It is hard to see how this standard does violence to first amendment values.
 
 
 35
 In the present case, despite the absence of an express ruling that BAR's solicitation included statements that were fraudulently or deceptively made, the Commission's opinion leaves little doubt that BAR's statements were at least misleading. That a few of the statements were discovered after the fact to have been inadvertently accurate offers no justification for BAR's manifestly unequal treatment of CP and MEC, and does not rebut an overall judgment that the solicitations were recklessly made.
 
 
 36
 Finally, we dismiss BAR's argument that the Commission's findings were not supported by substantial evidence on the record viewed as a whole. Though BAR can point to portions of the record that might have justified findings different from the Commission's, the Commission could properly choose to rely on the evidence that it found most trustworthy and plausible. Consolo v. FMC, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). Its conclusions derive substantial support from the record: this is the test they must satisfy. Illinois Central RR. Co. v. Norfolk & Western Ry. Co., 385 U.S. 57, 66, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 5 U.S.C. § 706(2)(E).
 
 III Damages
 
 37
 1. The Commission's method of calculation.
 
 
 38
 To calculate the extent of the damage to MEC and B&M resulting from BAR and CP's unlawful conduct, the Commission applied a "before and after" test. It projected the expected market shares of the two carriers in certain divertible commodity traffic on the basis of previolation market figures, and compared those shares with the actual market shares enjoyed by MEC and B&M over the period from 1970 through 1974, when the unlawful activity was in progress.[13] The market share differential was then translated into terms of carloads lost by the carriers for each commodity. Each carload of a given commodity was assigned a figure representing the average gross revenue brought in by such carloads. To each carload was also attributed a portion of the carrier's operating expenses, including certain overhead costs which were determined in accordance with guidelines developed in rate-making procedures before the Commission. These costs were integrated into the damage formula by application of certain "operating ratios" calculated in standard fashion by the Commission; those ratios reflect the proportion of expenses to revenues in traffic of a given commodity. The Commission totaled the estimated net revenues lost per carload in each type of traffic, combined with the number of carloads lost per commodity by virtue of BAR's conduct, to give a monetary estimate of the injury suffered by MEC and B&M. The Commission attempted to exclude from its calculation, traffic that originated or terminated on MEC, B& M, or CP, since that traffic would not have been subject to diversion. B& M's damages were assessed essentially as a proportion of MEC's award. See infra.
 
 2. Damages The carriers' primary objections
 
 39
 All three carriers complain at length about the Commission's computation of damages. BAR strenuously argues that no damages at all should be recovered by MEC and B&M. It says that the proofs relied on by the Commission and proposed by those carriers are "purely speculative" and fail to satisfy the standards of proximate cause required in a court of law. We find this contention without merit. A similar "before and after" comparison of market shares has been accepted in antitrust litigation when more precise measurements of the plaintiff's damage would be too burdensome or are unobtainable for some other reason. See, e. g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Harverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 804-07 (1st Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964). BAR contends that by examining interchange reports for Brownville and Northern Maine Junctions over 1970-74 and interviewing shippers, the injured carriers could and should have reconstructed unlawful solicitations and the shippers' state of mind with regard to individual shipments in order to arrive at a precise count of shipments that were unlawfully diverted. But such an investigation would have required combing through the records of more than ten thousand shipments in each year of the five-year period. The difficulty of the task has been augmented by BAR's destruction, since the violation, of interchange information concerning the destinations of the diverted freight, as well as of the computer printouts on shippers that BAR passed on to CP. The law does not demand that injured parties be so burdened. The wrongdoer could be required to bear the risk of uncertainty in the calculation of the number of carloads diverted by its actions, see Story Parchment, supra, 282 U.S. at 563-65, 51 S.Ct. 248. The Commission supportably found that MEC and B&M had met the burden of establishing "some resultant injury" from the § 3(4) violation.[14] This was a rational inference, for, as the ALJ explained,
 
 
 40
 "(t)here are no facts of record which evidence service superiority in movements via Brownville Junction over Northern Maine Junction. In 1969 the transit times via the two interchange points were comparable. Routing changes resulting from carrier rate adjustments and concessions are short term and occur in both study and compared periods. There is no evidence of any abnormal market trend in the compared periods which affected originations and terminations on BAR. Nor is there any evidence of changes in supply sources and sales outlets that required elimination of MEC or MEC and B&M participation as intermediate carrier or carriers in the movements. What were present in the 1970-74 periods which were not present in 1969 were (1) the BAR-CP agreement and solicitation campaign and (2) the Great Northern-CP 100 car a month agreement."[15]
 
 
 41
 Once the fact of injury was demonstrated, the Commission was authorized to determine if "any party . . . is entitled to an award of damages under the provisions of this chapter for a violation thereof." 49 U.S.C. § 16(1). The method of assessing the damages to be charged to BAR became a matter for the Commission's reasoned judgment, based on its expertise in the field. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); see Bagel Bakers Council v. NLRB, 555 F.2d 304, 305 (2d Cir. 1977). The Commission had merely to settle on a reasonable and rational method of computation, see Bagel Bakers Council, supra. We must defer its choice among rational methods. NLRB v. Seven-Up Bottling Co., supra. The Commission's decision to award damages for this § 3(4) violation, with its reasoned conclusion as to their measurement, reflected a policy choice peculiarly within its realm. See 49 U.S.C. § 12; Consolo v. FMC, supra,383 U.S. at 620-21, 86 S.Ct. 1018 (1966); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); United Van Lines, Inc. v. ICC, 545 F.2d 613 (8th Cir. 1976); cf. American Power and Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946); Maine Potato Growers v. Butz, 540 F.2d 518 (1st Cir. 1976). See generally 4 Davis, Administrative Law Treatise § 30.10 (1958). Applying these principles, we disagree with BAR that the Commission's methodology was outside acceptable limits, as providing a reasonable yardstick for estimating the harm visited on MEC and B&M by BAR's actions.
 
 
 42
 While BAR seeks elimination or reduction of the award, the injured carriers seek reinstatement of the ALJ's higher assessments. Thus they ask us to remand the case with instructions to reinstate the ALJ's decision and award. However, it is not our province to choose between the awards of the ALJ and the Commission. Any review of the ALJ's actions is only incidental to our review of the Commission's decision. See 28 U.S.C. §§ 2321, 2342, 2344. The Commission was in no sense bound by the ALJ's recommendation. "An agency loses no power of decision by having an administrative law judge preside at a hearing." Davis, Administrative Law of the Seventies (1976 Supp. to Administrative Law Treatise) § 10.03 at 313. See Adolph Coors Co. v. FTC, 497 F.2d 1178, 1184 (10th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). A reviewing court may consider the decision of the ALJ as part of the record, but, except on matters of credibility, it is due little deference when the Commission has made an independent evaluation that is substantially supported by the evidence. See United States Retail Credit Ass'n, Inc. v. FTC, 300 F.2d 212, 216-17 (4th Cir. 1962).
 
 
 43
 Thus the question before us is not whether the ALJ's approach was, in our view, better, but simply whether the Commission's method of computing the extent of the carriers' injury was rational. As regards the latter question, the injured carriers are not persuasive in arguing that it was not. MEC and B& M maintain that their projections of market share (which the ALJ accepted) based on the percentage of the market held by each during 1969, a one-year period, should not have been rejected by the Commission. The Commission, however, deemed those to be speculative, and made independent market share projections, based on market share figures for the preceding five to eight years. Where a trend was evident, the Commission extrapolated from the figures according to the trend; where no increasing or decreasing market share appeared, the Commission averaged the statistics for the preceding years and applied that simple average as a constant estimated market share during the period of the violation in order to evaluate the carriers' loss as indicated by the traffic that was actually shipped over their lines during that period. Where figures were not available for more than a one or two-year period before the violation, the Commission declined to award damages, finding the projections based thereon "purely speculative." (As noted above, this was the case for traffic in clay and wood pulp). Even if, as MEC and B&M maintain, a finding of wilfulness would have warranted applying a more lenient burden of proof on MEC and B&M as to the extent of their injury, this principle does not require that an alternative method, perhaps a more accurate method, be abandoned because a rougher calculation might do. In its report, the Commission examined the alternative methods proposed by the carriers, explained its reason for rejecting them, and set forth in some detail the analysis it chose to rely on. We cannot say as a matter of law that these methods were unreasonable nor that the Commission was bound to accept less definite projections. Application of the before and after test itself represented an accommodation to plaintiffs' difficulty in the precise proof of damages. The Commission was not required to award damages on the roughest version of the already imprecise measurement.
 
 
 44
 Equally unpersuasive is MEC and B&M's challenge to the Commission's use of an average cost rather than incremental cost analysis in its computation of the expenses that the carriers would have sustained had they handled the diverted traffic. MEC maintains that no overhead costs should have been attributed to the additional traffic to determine the net revenues lost by the diversion; thus, it urges that we must find error in the Commission's application of the operating ratios. But the Commission responds that it was forced to use the operating ratios because the cost data offered by MEC was deficient. The result was that "each carrier (was) entitled to the same earnings on the projected traffic that was diverted as they (were) on all other traffic." We are unable to say that the approach taken was unreasonable. See generally Seven-Up Bottling, supra.
 
 
 45
 MEC further complains that it should have received an award of 8% Interest on the damages due it. The Commission is empowered to award interest on the compensatory recovery. Louisville & Nashville RR Co. v. Sloss-Sheffield Steel and Iron Co., 269 U.S. 217, 239-40, 46 S.Ct. 73, 70 L.Ed. 242 (1925). Its decision is not for us to disturb except in the face of abused discretion. See, e. g., George Allison & Co. v. ICC, 70 App.D.C. 375, 107 F.2d 180 (1939), cert. denied, 309 U.S. 656, 60 S.Ct. 470, 84 L.Ed. 1005 (1940). While its award of interest at 4% Is lower than the current commercial rate, both MEC and B&M appear earlier to have sought only 6% Interest and the carriers failed to object to the ALJ's decision to award only 4% Interest. Given these facts and the breadth of the Commission's discretion with respect to the awarding of any interest at all, see George Allison & Co., supra, we are not persuaded that the Commission's low award exceeded its discretion.
 
 
 46
 The injured carriers also question the Commission's methodology in reducing B& M's award from the sum originally calculated by the ALJ. The Commission discovered that the method it had relied on in recalculating MEC's costs and projecting its market share over the period of the violation could not be employed to analyze B&M's loss, since the data concerning B&M's routes and traffic could not be similarly parsed. It concluded that a sufficiently certain award could be determined by taking B&M's original calculation loss, which had been constructed on terms parallel to MEC's calculation, and reducing it in the same proportion that its recalculation of MEC's loss prompted reduction of MEC's award. Thus, if the Commission determined that MEC's original claim on starch traffic overstated its ascertainable loss by 10 percent, for example, then the Commission would diminish B&M's claim on starch traffic by 10 percent to arrive at its award. Since B&M derived its divertible traffic from MEC, the presumption that their losses would be proportionate does not strike us as unreasonable.
 
 
 47
 B&M challenges the Commission's failure to make its reduced damage award sensitive to B&M's assertedly rising share of MEC/BAR traffic, and reasserts that its own proposed calculations were sufficiently definite to support an award. But the Commission ruled that projections of market share based on one year of data were speculative, in that they unjustifiably presume the share will remain constant. That reasoning, which we have already upheld, placed the Commission in a position where it could award nothing to B&M, for lack of proof on the extent of injury, or try to develop a reasonable accommodation. It attempted the second alternative, with an acceptable, if somewhat rough, result. It is possible to debate the particulars of the method adopted. That the award did not explicitly take account of B&M's allegedly growing market share of MEC traffic does not seem to us fatally to skew its result, especially since the "growing" market share asserted by B&M is also based on rough calculations. In the circumstances, we find the analysis of B&M's damages to have constituted a reasonable exercise of the Commission's authority to "determine the amounts to which a carrier is entitled" under § 16(1) of the Act. We therefore affirm that part of the award.
 
 
 48
 We return now, in reviewing the damages awards, to certain of BAR's challenges to specific items. BAR questions the correctness of the Commission's recompensing MEC and B&M for traffic diverted as a result of CP's, rather than BAR's, solicitation efforts. It argues that CP's own solicitation was within the protection of the Commission's ruling that a carrier may freely solicit on its own behalf under § 3(4). But while CP itself might well be so protected, the Commission was entitled to find that BAR had "unduly prejudice(d)" the two connecting carriers not only by means of its own solicitation for CP, but by abetting CP's solicitation. Section 3(4) prohibits BAR, as the originating carrier, from throwing its weight exclusively behind the solicitation campaign of one of its connecting lines to the detriment of other connecting lines. BAR's plan provided for intensified solicitation by CP as well as itself, and expansion of CP's interchange facilities to handle additional traffic. BAR aided CP's effort by providing CP with information concerning shippers, manipulating its boxcar supply as described in the Commission's opinion, and coordinating its own soliciting efforts with CP's, occasionally approaching shippers together. If CP had independently increased its solicitation effort, BAR would of course not be responsible for its results. But as CP's efforts were instigated, encouraged, planned and participated in by BAR, and as § 3(4) prohibited BAR's furnishing this kind of support on a preferential basis, BAR must accept responsibility for the results of CP's actions, and was properly held liable for them. A tortfeasor is liable for all the foreseeable consequences of his action. See generally Prosser, Law of Torts § 42 (4th ed. 1971).
 
 
 49
 3. Damages The Great Northern-Canadian Pacific agreement
 
 
 50
 Pursuant to an agreement with CP made in December 1969, Great Northern Paper Co. (GN), a major shipper located in Maine along BAR's line, undertook to ship about 100 more cars monthly via CP's Brownville Junction route. See note 15, supra. In return GN was to be assured 100 additional empty cars per month by CP. This additional traffic was included by the Commission in its damages calculations against BAR even though GN, not BAR, had initiated the arrangement and although the arrangement preceded by over six months the execution of the formal solicitation agreement between BAR and CP.
 
 
 51
 While the question is close, we think the record sufficiently supports the conclusions of the ALJ and Commission that this diversion of traffic, which began while BAR, after being acquired by Dumaines, was undertaking a program to divert traffic to CP, and which continued in effect for several years after the solicitation arrangement was instituted, was an outgrowth of BAR's wrongful conduct. GN's primary aim was to be assured of a ready supply of boxcars of the right type, at a time when it feared a BAR takeover of MEC, which might divert some of BAR's stock to MEC's more depleted lines. CP's aim, of course, was to increase its traffic. There was evidence from which the Commission could determine that from the early stages of the arrangement BAR played a key, and not disinterested, role in facilitating the arrangement by itself providing the boxcars which CP was supposed to furnish, thus relieving CP of its obligation; GN, in the meantime, observed its end of the bargain with CP by shipping the extra loaded cars via CP's Brownville Junction, thus accomplishing BAR's objective of diverting traffic away from MEC. Indeed, BAR notified CP early in January of 1970 that CP could be assured of the additional traffic but would not have to furnish any of the equipment. BAR included the traffic diverted under the GN-CP agreement in its estimates of the total number of cars it could divert to Brownville Junction, and, under the BAR-CP agreement, was to receive car allowances from CP for at least some of that traffic.
 
 
 52
 There was evidence, moreover, that in the fall of 1969 BAR's president helped stimulate the CP-GN arrangement by advising GN, unjustifiably it might be thought, that MEC had played a lead role among all the carriers in proposing a so-called "arbitrary" (a rate increment) which would have adversely affected GN and greatly irritated its management. One of GN's motives in the CP arrangement was to strike back at MEC for this. In brief, it could be found that BAR's role in the GN-CP arrangement was substantial if covert, and that the arrangement was nurtured by the same design to prejudice MEC in the distribution of traffic that came to flower in the June agreement. See Haverhill Gazette Co. v. Union Leader Corp., supra, 333 F.2d at 804-07.
 
 
 53
 It is true that GN's people denied being solicited by BAR prior to making the CP arrangement; but they acknowledged full awareness of the jockeying going on between Dumaines, BAR and MEC, and they were plainly concerned over any possible effect on car supply. It could be inferred that GN, being dependent on BAR's line, wished to remain in BAR's good graces at all times. The ALJ and Commission, having heard the extensive testimony and with greater knowledge of the industry than ourselves, were equipped to determine from all the circumstances, including the timing and BAR's role in underwriting the GN-CP arrangement by furnishing (and even purchasing 100 new, special-type) boxcars, whether what took place should be attributed to pressures emanating from BAR's grand design to divert traffic from MEC, or whether instead it was a mere coincidence that an arrangement dovetailing so well into BAR's plan had come into being.
 
 
 54
 4. Damages The period from January to June, 1970
 
 
 55
 BAR complains that the Commission erred in awarding damages for the period from January 1, 1970, to June, 1970, before BAR and CP reached final agreement on the terms of their pact. However, we find substantial evidentiary support for the earlier award. When the BAR-CP agreement was executed in July, it was made retroactive to January, 1970. CP thus became liable to compensate BAR for all additional traffic flowing over CP lines from January to June, the increase to be measured by comparison with the previous year's traffic. The Commission could permissibly view this as an admission by BAR that its own actions were fairly related to any increases after the first of the year. There was evidence, also, that in February, 1970, BAR furnished CP with otherwise undistributed information concerning BAR's shippers, in aid of CP's ongoing solicitation effort.[16] There is, besides, the evidence already discussed of BAR's role in the diversion of Great Northern traffic from MEC to CP lines in late 1969, and early 1970. The Commission noted one specific instance, occurring in March 1970, where a CP solicitor successfully persuaded a shipper to divert its freight to CP routes. Also, the first of MEC's inquiries into the reasons behind its decreased traffic came in the early months of 1970. While it appears that BAR and CP's campaign in all its facets did not begin in earnest until June, 1970, there is ample basis for the Commission's award to include compensation for traffic lost during the first five months of that year.5. Damages Official notice
 
 
 56
 The carriers raise several objections to the Commission's procedures affecting the calculation of damages. All contend that the Commission erred in taking official notice of figures filed by the carriers with the Commission, compiled in "Quarterly Commodity Statistics" (QCS) reports. Those statistics represent the numbers of carloads of various commodities that traveled over different lines during a given period of time. Though no carrier disputes the accuracy of the figures which they submitted to the Commission, they do take issue with the Commission's using them in its damages calculation, as a source for its projections of market share. They request remand on the issues of damages for this reason. (MEC suggests alternatively, as discussed above, that we order the Commission to reinstate the damage order of the ALJ).
 
 
 57
 We agree with the Commission that the parties have forfeited their right to object to the use of this data. The Administrative Procedure Act gives a party a right to object to the use of official notices when such an objection is timely filed. 5 U.S.C. § 556(e). The relevant Commission rule for reopening, 49 C.F.R. § 1100.101(e), provides,
 
 
 58
 "Except for good cause shown, and upon leave granted, petitions under this section (entitled petitions for rehearing, reargument, or reconsideration) must be filed within 30 days after the date of service of a decision or order, . . ."
 
 
 59
 BAR filed a petition for review of the order before this court, thus depriving the Commission of jurisdiction, 28 U.S.C. § 2349, on February 11, 1977, the day the order was served. Two months later, on April 21, 1977, BAR requested this court's permission to file a petition to reopen the ICC proceedings "for the receipt of additional evidence and argument concerning matters of official notice", i. e., the QCS reports. MEC and B&M both filed oppositions to BAR's request, and this court denied the request. Now, MEC and B&M join with BAR in contesting the Commission's use of the statistics. While the ground is doubtless technical, we are not disposed to relieve BAR of non-compliance, and we have even less sympathy for the other carriers. The need for a rule of timeliness becomes especially apparent in a complicated case such as this. Presenting a technical matter first to the Commission would have afforded the Commission the opportunity to explain and reconsider its methodology, clarifying its reasoning in pertinent ways, if not dispelling the parties' doubts, before being subject to judicial scrutiny. Cf. Presque Isle TV Co., Inc. v. United States, 387 F.2d 502, 504-06 (1st Cir. 1967); Davis, Administrative Law Treatise § 20.06 (1958). From the papers filed in this court, we observe no manifest injustice to have been caused by the Commission's use of the figures. The Commission identified the source of the data and adequately explained its application of the statistics. Compare Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937).
 
 
 60
 In a related vein, MEC and B&M complain of the Commission's alleged failure adequately to explain the source and methods for the derivation of the market shares that it attributed to MEC and B&M in its calculation. They also urge that it was error for the Commission not to set forth in detail the calculation of the projected market shares done pursuant to the trend analysis. These errors, it is claimed, make this part of the report unreviewable, and hinder the carriers' evaluation of its accuracy. The methods and general theory of calculation are set forth in the Commission report, with its attached appendices, sufficiently for this court to review. We find the Commission to have employed a reasonable and comprehensible analysis of the changing market patterns. All the details of tabulating shipments do not need to be set out so long as their sources are indicated; the Commission need not append all its accounting data and worksheets to establish the essential reasonableness of its calculation. The other aspect of the carriers' analysis we find sufficiently bound up with their official notice claims to dispose of on the same grounds: they should have made timely objection to the Commission, which could have furnished them with the appropriate worksheets and entertained any objections the carrier might have cared to lodge.
 
 6. Damages The Statute of Limitations
 
 61
 Finally, BAR submits that the Commission should not have tolled the two-year statute of limitations prescribed in § 16(3)(b) of the Act, and should therefore have limited MEC and B&M's recovery to the two year period immediately prior to the filing of their complaints in 1974. The Commission implicitly found, and now argues in its brief, that MEC and B&M did not learn of the existence of a cause of action until 1972 when the terms of the BAR-CP agreement came to the attention of MEC's president. It further found that the injured carriers had exhibited reasonable care and diligence during the period of 1970-72, in their efforts to uncover the reason behind the decline in traffic shipped over their lines. Its auxiliary conclusion that BAR and CP were less than straightforward with MEC and B&M about the essential terms of their agreement can fairly be discerned from its report. Revelation of those terms might have led to earlier institution either of suit by the carriers or of investigation by the Commission.
 
 
 62
 The evidence before the Commission showed that MEC and B&M repeatedly wrote letters and made oral inquiry of shippers and carriers in pursuit of the agent of their sudden adversity. However, while the carriers' investigation uncovered the intensified sales effort by CP and, possibly, by BAR enough to trigger a counter-solicitation effort by MEC the full extent of BAR's design remained hidden until disclosure of the agreement. Only then did the other carriers learn of the reciprocal commitment, the car allowances, the single-minded purpose to divert all traffic possible. It was a permissible inference that the BAR-CP solicitation program, and the correlative violation of § 3(4), was effectively concealed from the connecting carriers through July of 1972 even though bits and pieces of information had come earlier to their attention. The Commission refers to several instances documented in the record where BAR in fact affirmatively misled the inquiring carriers as to the nature of its activity.[17] We think the record sufficiently supports the Commission's ruling that the statute was tolled, allowing recovery, therefore, for the full period of the violation. See American Pipe and Construction Co. v. Utah, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Bailey v. Glover, 21 Wall. 342, 348, 88 U.S. 342, 348, 22 L.Ed. 636 (1875); cf. Arneil v. Ramsey, 550 F.2d 774, 780-82 (2d Cir. 1977) (securities fraud); Janigan v. Taylor, 344 F.2d 781 (1st Cir.), cert. denied, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965) (securities fraud).[18]IV The Cease and Desist Orders
 
 
 63
 While we uphold the Commission's finding of liability, and of damages, we are troubled by the sweep of the cease and desist orders. The most immediate cause of our concern is the Commission's failure in its report to clarify and define the conduct which the Commission will treat as violative of § 3(4). This inadequacy might be of no moment if the boundaries in this area of regulatory law had been spelled out in other agency decisions or in regulations and rules or if the cease and desist orders themselves were reasonably detailed. But we deal with a general statute which has received scant judicial or administrative construction in the relevant area and which is otherwise unexplained.
 
 
 64
 It is true that the definitional failings in the Commission's report have not deterred us from upholding the Commission's findings against BAR. This is because the BAR-CP arrangement, solemnized in a formal agreement, was a " hard core" violation, clearly foreshadowed by the Southern Pacific case and the language of § 3(4) itself. Had there been some question in our mind as to the legality of the conduct and as to the basis for the Commission's findings with respect to BAR, we would have remanded; but we see no likelihood that the infirmities in the report could have prejudiced the outcome. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 806-10, 820-22, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); United States v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 294 U.S. 499, 510-11, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). However, the cease and desist orders, especially the one applicable to BAR, raise a different problem. BAR is to "cease and desist and thereafter abstain from unlawful preferential solicitation and exercise of its discretion in the distribution of traffic in violation of § 3(4) . . . ."[19] A cease and desist order through reference to other available sources if not within its own corners must set forth the perimeters of prohibited conduct with reasonable specificity. NLRB v. Express Publishing Co., 312 U.S. 426, 433, 61 S.Ct. 693, 85 L.Ed. 930 (1941); see 5 U.S.C. § 557(c); Fed.R.Civ.P. 65(d). BAR and CP may be subject to contempt actions or even criminal penalties if found to have violated the orders. 49 U.S.C. §§ 10(1), 16(7), 16(8), 16(12). While they are adequately forewarned against blatant solicitation arrangements of the type in issue, the Commission has done nothing to advise carriers of the other types of conduct which will and will not be deemed violative of § 3(4). Even in our brief exposure in the course of these review proceedings, it has become apparent that outside the area of hard-core conduct, there is a vast unillumined area concerning preferential solicitation and related activity and the application of the statute. For example, the Commission tells us in its report that "preferential solicitation agreements are to some extent commonplace in the railroad industry, and . . . railroads often solicit their best revenue routes and/or their best service routes." It is impossible to know from this what "preferential solicitation agreements," if any, the Commission is prepared to endorse as falling outside the strictures of § 3(4). It is likewise hard to know whether an originating carrier such as BAR could solicit shippers to use a connecting line that formed part of its own best revenue route. Many other questions come to mind: May carriers safely join in solicitation arrangements for the purpose of competing with other modes of transportation? What may an originating carrier safely do when asked for a routing recommendation by a shipper? If an originating carrier can demonstrate that one connecting line is significantly better than another in the service it renders, may it advise its shippers to use that line consistently or must it undertake an individual analysis for each shipper? What non-service considerations, if any, will justify a preferential arrangement.?[20]
 
 
 65
 We would not expect all of these questions to be answered by the Commission, but before approving a cease and desist order we think the Commission should do more to signal its construction of the outer limits of § 3(4). While § 3(4) reflects, in its broadest sense, the policy of Congress, the articulation of rules guiding its specific applications is the province of the Commission. We do not think that carriers should be ordered to cease and desist from conduct much of which they can only guess at. The Commission must " fashion() orders which are, at the outset, sufficiently clear and precise to avoid raising serious questions as to their meaning and application," FTC v. Broch & Co., 368 U.S. 360, 368, 82 S.Ct. 431, 436, 7 L.Ed.2d 353 (1962). See New York, New Haven and Hartford RR Co. v. ICC, 200 U.S. 361, 404, 26 S.Ct. 272, 50 L.Ed. 515 (1906).
 
 
 66
 We thus vacate the cease and desist orders as presently entered, and remand to the Commission for further proceedings during which it may, at its option, revise the orders so as to reflect greater particularity or follow some other course, such as amending and clarifying its report in this case, or issuing rules and regulations, which would provide BAR and CP with reasonable guidance as to the prohibited conduct. Cf. Northeast Airlines, Inc. v. CAB,331 F.2d 579 (1st Cir. 1964). If the latter course is properly followed, the Commission might be justified in issuing new cease and desist orders of comparable brevity to the present ones. See FTC v. Colgate-Palmolive Co.,380 U.S. 374, 394-95, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965). Our point is not that the orders themselves need necessarily be detailed, but that there must at least exist a frame of reference so that those to whom they are addressed can know what is expected of them.
 
 
 67
 The Commission's damage awards are sustained, the cease and desist orders are vacated, and the case is remanded to the Commission for further proceedings consistent herewith.
 
 
 68
 No costs.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 **
 Of the Northern District of California, sitting by designation
 
 
 [1]
 That section reads in pertinent part that "all carriers . . . shall not . . . unduly prejudice any connecting line in the distribution of traffic that is not specifically routed by the shipper."
 
 
 [2]
 The ALJ, in his initial decision, had directed BAR to pay damages of $1,590,438 to MEC and $688,330 to B&M, with 4% Interest
 
 
 [3]
 B&M connects with MEC to complete the alternative through route
 
 
 [4]
 MEC also connects with CP and Canadian National Railway (CNR), on different through routes, apparently
 
 
 [5]
 The parties do not contest that CP, and MEC with B&M, are similarly situated "connecting lines" for purposes of the Act. See Western Pacific Ry. v. United States, 382 U.S. 237, 86 S.Ct. 338, 15 L.Ed.2d 294 (1965)
 
 
 [6]
 BAR disagrees with the Commission on the timing of its solicitation efforts. See infra, IV(4)
 
 
 [7]
 BAR argues that the Commission "does not at any point in its decision state that, as a general matter, those factors (the comparisons) were misleading or invalid." This is accurate, but the import of the Commission's criticism fairly lay in the absence of conscientious comparison as foundation for these substantive recommendations, rather than in any truth they inadvertently stumbled upon
 7A The parties agree that the issue of § 3(4)'s construction was presented to the Supreme Court in the appellants' jurisdictional statement.
 
 
 [8]
 Interpreting § 3(4) is a question of law, "ultimately to be decided by courts," Ferraro v. INS, 535 F.2d 208, 209 (2d Cir. 1976), see 5 U.S.C. § 706(2)(A), (C). Although the precise contours of the standard of review to be applied to an agency's construction of its enabling statute are subject to varying formulations, compare United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858 n. 25, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975) (entitled to "considerable weight"), with Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969) (follow unless there are "compelling indications that it is wrong"); Zemel v. Rusk, 381 U.S. 1, 11-12, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) ("must be given weight"); United States v. Public Utilities Commission of California, 345 U.S. 294, 314, 73 S.Ct. 706, 97 L.Ed. 1020 (1953) (Court's "sympathy" with established administrative interpretations), where an agency's interpretation of the statute it is charged with enforcing is consistent with the statute's language and evident Congressional purpose, we accord it some deference:
 "Our charter is limited . . . . (A)t least . . . if the agency's interpretation can be seen, without straining, to be consistent with the statutes, we should accept it."
 Silva v. East Providence Housing Authority, 565 F.2d 1217, 1218 (1st Cir. 1977).
 
 
 [9]
 BAR complains not only that the statute does not reach its conduct an argument which, in its various aspects, we entirely reject, infra but also complains that the Commission fails "with sufficient clarity to guide BAR's future conduct, or to permit effective judicial review of the Commission's order," in that it does not delineate "what BAR did that violated § 3(4)." We agree that the Commission's opinion contains some puzzling aspects and for that reason refuse to affirm the cease and desist order, infra. But we do not agree with BAR's contention that the kind of aggressive solicitation which it undertook for, and in conjunction with, CP, was not clearly violative of § 3(4); nor do we find the Commission's findings as to that violation to be so unclear as to be unreviewable
 
 
 [10]
 We leave open the possibility that solicitation by an originating carrier could in some circumstances find a legal justification in factors other than service differential. There may be other facets of the Act, or Commission policies present or future, affording a proper basis for different exceptions to the general rule requiring impartial treatment. Such a possibility is at least suggested in the language of the Commission's report which refers intriguingly to preferential solicitation agreements "that are to a certain extent commonplace in the railroad industry," and also recognizes a railroad's soliciting of its "best revenue routes," leaving it unclear whether such solicitation would be approved by the Commission even though preferential
 But while the outer limits of § 3(4) in other circumstances are thus obscure, we see no uncertainty about § 3(4)'s application to the "hard core" conduct here in question. See Broadrick v. Oklahoma, 413 U.S. 601, 608, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). No exceptions of the sort we have in mind, i. e. specific exceptions with a technical basis in the Act or in Commission policies, have been identified as affording BAR an escape hatch. BAR does say that in years past it entered into agreements with complainants and others comparable to the one with CP, but the record does not bear out its contention of comparability. And it is no defense that the Commission has not policed § 3(4) aggressively, in the absence, at least, of a showing that the Commission has actively licensed conduct of the sort BAR has engaged in.
 
 
 [11]
 " § 8. Liability in damages to persons injured by violation of law
 In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."
 " § 13, par. (1). Complaint to Commission of violation of law by carrier, reparation; investigation
 Any person, firm, corporation, company, or association, or any mercantile, agricultural, or manufacturing society or other organization, or any body politic or municipal organization or any common carrier complaining of anything done or omitted to be done by any common carrier subject to the provisions of this chapter in contravention of the provisions thereof, may apply to said Commission by petition, which shall briefly state the facts; whereupon a statement of the complaint thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing, within a reasonable time, to be specified by the Commission. If such common carrier within the time specified shall make reparation for the injury alleged to have been done, the common carrier shall be relieved of liability to the complaint only for the particular violation of law thus complained of. If such carrier or carriers shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper."
 " § 16. Orders of commission and enforcement thereof
 Award of damages
 (1) If, after hearing on a complaint made as provided in section 13 of this title, the commission shall determine that any party complainant is entitled to an award of damages under the provisions of this chapter for a violation thereof, the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named."
 
 
 [12]
 For example, the Commission cites one instance where Great Northern, one of the major shippers over BAR lines, asked the president of BAR "whether BAR would be disturbed if Great Northern routed more traffic by CP." This does not suggest a lack of consideration for an originating line's views
 
 
 [13]
 The Commission found that similar projection of market shares for clay and woodpulp traffic would be speculative because the figures available to it concerning the traffic in those commodities prior to the violation were too limited. It therefore did not award damages for lost traffic in those goods
 We discuss infra BAR's contention that, whatever the justification for damages after mid-1970, there was no evidence of harmful conduct in the first half of 1970.
 
 
 [14]
 We do not accept BAR's characterization of the Commission's statement as a "flimsy finding". The Commission seems to have meant, simply, that the fact of damage had been proved, without implication concerning the extent of damage
 
 
 [15]
 This was an agreement reached in late 1969 between CP and Great Northern Paper Co. (GN), a major shipper of paper over the routes in question, in which GN committed itself to ship 100 additional carloads a month over CP lines in return for CP's guarantee of furnishing BAR 100 additional cars a month for GN's use. See infra. (CP agreed to provide GN with "5 cars per day on a seven-day a week basis," making a total of about 460 per month, compared with 360 cars per month previously routed over CP lines.)
 
 
 [16]
 BAR maintains that this information was furnished CP "on the understanding that CP would not use the printout material until an agreement had been worked out." Aside from the absence of a record reference for this alleged understanding and the fact that the information was provided months before the agreement was formalized, the inference that CP may have used this information in its admittedly ongoing solicitation efforts does not seem far-fetched, and was open for the Commission to make. Even if CP did not attempt new solicitation before June on the basis of that information providing CP this data an accommodation not offered to MEC nor to other connecting lines of BAR evidenced prejudicial conduct vis-a-vis the other carriers, and taken with the other proof justified the earlier award
 
 
 [17]
 The Commission found that,
 "When in the spring of 1970 . . . (the) president of MEC discovered a sharp decline in freight traffic moving via Northern Maine Junction, he met with top executives of Fraser Paper Limited . . . and Great Northern on June 16 and 22, 1970, respectively, to fight the effects of the BAR-CP solicitation upon the paper freight. . . . Although MEC had been aware of an impending traffic agreement between BAR and CP, both BAR and CP later denied to MEC material information concerning the contents and scope of the July 31, 1970 agreement after repeated requests by MEC."
 The Commission went on to refer to MEC's observation of evidence indicating that MEC's president twice in 1970 wrote Mr. Dumaine of BAR and an executive of CP, requesting a copy of the agreement, and being denied that request. Further, the Commission found that early in 1970, the president of BAR wrote the president of MEC:
 "It has never been the policy of this company to solicit routings from the Great Northern Paper Company or other customers, and we have no intention of changing that policy."
 
 
 [18]
 While BAR vigorously maintains that its solicitations were legal, it simultaneously urges that MEC and B&M should have known enough to sue at the first inkling that BAR was soliciting on behalf of CP. Now, with voluminous detail before us, it seems apparent that the activities of BAR were well within the prohibition of § 3(4). But it is easily conceivable that the violation would not have been evident to a competing carrier privy only to bits and pieces of information about that activity. Furthermore, while the Commission did not regard the agreement as itself violative of § 3(4), no other piece of evidence revealed so dramatically the scope and purpose of BAR's actions
 
 
 [19]
 CP is to "cease and desist and thereafter abstain from aiding (BAR) in the violation of Section 3(4) of the Interstate Commerce Act."
 
 
 [20]
 Similarly, it is difficult to discern what significance the Commission attaches to the existence or absence of an actual agreement between carriers such as the one here. One of the mystifying parts of the Commission's report is a sentence stating that the BAR-CP pact "itself . . . is not violative of § 3(4)." Probably what is meant is that a mere piece of paper is not a violation of § 3(4) the agreement must be implemented, with the resultant prejudice in the distribution of traffic. But the Commission did not explain this, encouraging BAR to make the misleading and specious argument before us that the agreement "(w)as expressly held to be lawful." Obviously the Commission meant to hold no such thing: the agreement was highly improper unless we are to assume that BAR had no intention of carrying it out; it constituted significant evidence both of the existence and the deliberate and systematic nature of the violation. The comment nonetheless further blurs the contours of the Commission's holding and adds uncertainty, therefore, to its order