Ronald L. BULLION, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

A. Freeman EDGERTON, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

Anthony V. NOTO, Joseph A. Dazzio, and Carol L. Harelson, Petitioners,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

Nos. 88–4390, 88–4391 and 88–4409.

United States Court of Appeals, Fifth Circuit.

Sept. 5, 1989.

John P. Aydell, Jr., Baton Rouge, La., for Ronald L. Bullion.

A. Freeman Edgerton, Baton Rouge, pro se.

Peter T. Dazzio, Watson, Blanche, Wilson & Posner, William H. Patrick, Baton Rouge, La., for Anthony V. Noto, Joseph A. Dazzio and Carol L. Harelson.

James Clark, Charles L. Cope, II, Hoyle L. Robinson, Exec. Secretary, FDIC, Washington, D.C., for respondent.

Before WISDOM, KING and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The petitioners Ronald L. Bullion, A. Freeman Edgerton, Anthony V. Noto, Joseph A. Dazzio, and Carol L. Harelson appeal the assessment of civil penalties against them for violation of § 22(h) of the Federal Reserve Act, 12 U.S.C. § 375b, and its implementing regulations, 12 C.F.R. § 215.4(a) and (c). We uphold the determination of violations by the Board of Examiners of the Federal Deposit Insurance Corporation. There is substantial evidence in the record to support its conclusion. We further uphold the penalties awarded under the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j)(4)(A) and (B), except as to Dazzio. We reverse as to him and remand for reconsideration of an appropriate penalty.

## I. *Facts*

Dr. Joseph Dazzio was chairman of the board of the Metropolitan Bank & Trust Company of Baton Rouge (the "Bank"). Ronald Bullion, A. Freeman Edgerton, Anthony Noto, and Carol Harelson were officers.

Dazzio sought $1.5 million in financing from the Bank for the construction, renovation, and operation of the Sherwood Meadows Townhouses, owned by a limited partnership, Sherwood Meadows Properties, Ltd. Dazzio was the general partner and had exclusive control of this partnership.

To obtain financing, a transaction was structured under which low interest, multifamily housing revenue bonds in the amount of $1.5 million were issued by the Louisiana Public Facilities Authority. Interest on the bonds was set at 75% of Chase Manhattan Prime with a 30-year amortization, callable after ten years. The Sherwood Meadows partnership gave a $1.5 million promissory note and an assignment of rents to the issuer. Security for the issuers' loan consisted of a first mortgage on the townhouses, $174,000 cash in escrow, and a $100,000 certificate of deposit. Petitioner Dazzio also gave his personal guaranty for the indebtedness.

The Bank was the sole purchaser of the bond issue. In effect, the Bank loaned the money to Dazzio for this business endeavor, which is the way the transaction was treated at all times by the Bank. In reaching the decision to purchase the bonds, Directors Bullion, Noto, Edgerton, and Harelson relied on the oral report of Jimmy Davis, one of the Bank's lending officers, and a loan application that was prepared by him. Before the loan was actually funded on November 22, 1985, the file on this purchase included an appraisal of the townhouses dated August 7, 1985, based on the sales price of the properties if sold as condominiums, and a financial statement of Dazzio dated October 2, 1985, which indicated that he and his wife had a net worth of $2.2 million.

On November 7, 1986, the Bank was declared insolvent, and it was closed by the Louisiana Commissioner of Financial Institutions. While it had received a clean bill of health on November 16, 1983, the last time it had been examined, the Bank's stability had substantially declined as had the stability of many of the banks in this area of the country.

## II. *Prior Proceeding*

Pursuant to 12 U.S.C. § 1828(j)(4), a formal adversary enforcement proceeding was conducted against Dazzio and the directors for approving the purchase of the bonds (collectively, the "officers"). The enforcement process began on April 8, 1987, when the FDIC's Board of Review issued a Notice of Assessment of Civil Money Penalties, Findings of Fact and Conclusions of Law, Order to Pay and Notice of Hearing. 12 U.S.C. § 1828(j)(4)(C). The notice informed the officers that the FDIC was seeking penalties in the amount of $290,000 against Dazzio, $8000 against Raymond E. Kron, Jr., and $3000 against each of the other eleven directors of the Bank.

The notice alleged violation of 12 U.S.C. § 375b, and its implementing regulations, 12 C.F.R. § 215.4(a) and (c).[1] Under

---

**1.** These provisions are part of what is commonly known as "Regulation O." 12 C.F.R. Part 215.

§ 215.4(c), the FDIC Board alleged that the extension of credit to Sherwood Meadows Properties violated the Bank's lending limit because the partnership was a business interest of Dazzio who was an "insider" under the statute. The maximum amount that should have been extended to an "insider" under the lending limit was $1,225,-000, so that the Bank had overextended by $275,000 in the purchase of the bonds.

Under § 215.4(a), the Board alleged that the loan involved more than the normal risk of repayment or other unfavorable features. Only Dazzio, Edgerton, Noto, Harelson, and Bullion exercised their right to contest the proposed penalty assessment.

A hearing was held July 27–30, 1987, before an Administrative Law Judge. While the central facts of the loan were not contested, the officers advanced two contentions in their defense. As to the § 215.4(c) violation, they argued that Dazzio was not an "executive officer" so that he was not properly considered an "insider" under Regulation O. As to the § 215.4(a) violation, they argued that the extension of credit did not involve more than the normal risk of repayment or other unfavorable features.

On June 8, 1987, the ALJ held a pretrial conference to expedite discovery. At this hearing, the lead counsel for the FDIC, Phillip Schwartz, agreed to produce certain memoranda, including a memorandum sent from the FDIC's regional office in Memphis to the Washington D.C. office. On June 25, the FDIC provided the Bank officers with a two-and-one-half page memorandum, "Noto 2," which did not contain the regional office's recommendation and which was not signed.[2]

At the first day of the hearing, June 27, the officers protested not receiving Noto 2 until two days before the hearing. Schwartz explained that the FDIC had had trouble locating the document and that the FDIC had produced the entire document except for additions from Washington D.C. which could not be included because they were privileged. The officers moved for dismissal or a continuance. The ALJ denied the dismissal and stated that the motion for continuance would be taken under advisement. He told petitioners to reurge the motion after the FDIC rested if they needed extra time to prepare their defense because of the late compliance by the FDIC with the discovery request.

On June 28, the FDIC released the rest of Noto 2, "Noto 3." Noto 3 was the same document as Noto 2, but it included an additional one-and-a-half pages. The excised section revealed that the regional office had recommended penalties of $25,000 against Dazzio and $1000 against the other four officers. The document was signed by Schwartz in his capacity as Senior Regional Attorney for the FDIC.[3] An FDIC examiner further testified that no changes had been made to this document in Washington.

The officers again moved for dismissal on the ground that they would have subpoenaed the FDIC regional staff members mentioned in Noto 3 who recommended the lower penalties if they had received the complete memorandum earlier.[4] The ALJ denied the motion.

That same day, the FDIC Washington review examiner, Mr. H. Ronald Hoch, appeared as a witness for the FDIC. He testified on the violations that had occurred, on the penalties that were appropriate, and on his recommendation for the appropriate dollar amount of penalties that

Regulation O was promulgated by the Board of Governors of the Federal Reserve System and applies to insured State nonmember banks such as Metropolitan Bank, as well as banks which are members of the Federal Reserve System. 12 U.S.C. § 1828(j)(2).

**2.** Noto 2 stated the thirteen factors the FDIC considers in determining whether a penalty should be assessed where there has been a violation under the regulation. *See* footnote 19.

**3.** Schwartz' signature indicates he knew of the entire document on the first day of trial. It appears likely that the FDIC did not want to turn this document over because it suggested much lower penalties than the FDIC was seeking to have imposed.

**4.** The examiners who could have been subpoenaed to testify from Noto 3 included Sylvia Horn, a regional examiner, Roy Glass, the assistant regional director, and Bill Houston, the regional director.

should be assessed. The ALJ ordered the FDIC to produce all documents *in camera* that Hoch had relied on in preparing his testimony. The FDIC had expressed concern that the documents requested were privileged. The FDIC refused to produce the documents. The ALJ eventually dismissed Hoch from the stand for this reason, and he largely discredited Hoch's testimony in his recommended decision.

On January 22, 1988, the ALJ issued his Recommended Decision to the FDIC Board. In it he concluded that Dazzio was an "executive officer" within the meaning of Regulation O so that the Bank officers clearly had violated the "overline" provisions of § 215.4(c).[5] The ALJ found, however, that the FDIC had failed to prove a violation under § 215.4(a). He based this decision on the fact that the FDIC failed to show that the loan involved "preferential terms" under § 215.4(a)(1), a finding he found crucial to proving a violation at all under § 215.4(a). He recommended a $10,000 penalty against Dazzio and a $1000 penalty against each of the other directors based on the "overline" violation.

Petitioners and the FDIC enforcement counsel filed exceptions to the ALJ's decision. Petitioners asserted that the ALJ should have dismissed the suit because the FDIC had violated the petitioners' due process rights, the ALJ had found incorrectly that Dazzio was an executive officer, and the ALJ had inappropriately assessed money penalties. The FDIC asserted in its exceptions that the § 215.4(a) violation was improperly dismissed and the provisions governing it were improperly construed, that the ALJ improperly limited the scope of the evidence under § 215.4(a) to evidence available at the time the loan was made, and the ALJ erred in discrediting the testimony of Hoch as an expert witness.

On May 24, 1988, the FDIC Board issued its decision. The Board agreed with the ALJ that the officers of the Bank had violated the Regulation O overline provision. It also found, however, that the FDIC had proved a violation of § 214.5(a).

The Board found that the ALJ misinterpreted this section by requiring a showing of preferential terms. It thus conducted its own *de novo* review of the relevant facts and found the § 214.5(a) violation by the officers.

The FDIC Board also disagreed with the amount of penalties assessed by the ALJ. The Board ordered Dazzio to pay a penalty of $125,000, and the other officers each to pay $3000. Finally, the Board did not make any reference to the alleged due process claims of the officers that they had properly raised in their exceptions to the ALJ's decision.

The officers have appealed to this Court making three contentions. First, they were not in violation of either provision of Regulation O. Second, their due process rights were violated both by the notice that they received as to the charges against them and by the discovery abuses of the FDIC. Third, the amount of penalties assessed by the FDIC Board were arbitrary and capricious. We address each issue in turn.

### III.  *Standard of Review*

Pursuant to 12 U.S.C. § 1828(j)(4)(D), the findings of the FDIC Board are to be set aside only if found to be unsupported by substantial evidence on the record as a whole. *Sunshine State Bank v. FDIC*, 783 F.2d 1580, 1584 (11th Cir.1986); *NLRB v. Brookwood Furniture*, 701 F.2d 452, 456 (5th Cir.1983).

■ The remedies or penalties directed by the agency are not to be disturbed unless they constitute an abuse of discretion or are otherwise arbitrary and capricious. *Sunshine*, 783 F.2d at 1584; *Groos National Bank v. Comptroller of Currency*, 573 F.2d 889, 897 (5th Cir.1978). The Supreme Court has defined clearly the limited scope of penalty review: "The assessment of a penalty is particularly delegated to the administrative agency. The choice then of a sanction is not to be overturned unless 'it is unwarranted in law' or 'without justifica-

---

**5.** Violations of the maximum aggregate amount of indebtedness to bank "insiders" are known as   lending limit violations or "overlines."

tion in fact.'" *Butz v. Glover Livestock Commission Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973).

### IV. *The Regulation O Overline Violation*

■ Petitioners assert that the FDIC improperly found Dazzio to be an "executive officer." Since he was not an officer, § 215.4(c) of Regulation O was inapplicable to the Sherwood Meadows Townhouses transaction. The critical statutory provision, § 214.5(c), states in relevant part:

Aggregate lending limit. No member bank may extend credit to any of its executive officers or principal shareholders or to any related interest of that person in an amount that, when aggregated with the amount of all other extensions of credit by the member bank to that person and to all related interests of that person, exceeds the lending limit of the member bank specified in § 215.2(f) of this part.

29 C.F.R. § 214.5(c).[6] It is not disputed by the officers that if Dazzio is an "executive officer," then there has been a violation of this provision.[7] We therefore limit our discussion to the status of Dazzio. We conclude that the ALJ and FDIC Board were correct in finding that he was an executive officer.

Under § 215.2(d), an executive officer under Regulation O is defined in relevant part:

"Executive officer" of a company or bank means a person who participates or has authority to participate (other than in the capacity of a director) in major policymaking functions of the company or bank, ... The chairman of the board, the president, every vice president, the cashier, the secretary, and the treasurer of a company or bank are considered executive officers, unless (i) the officer is excluded, by resolution of the board of directors or by the bylaws of the bank or

company, from participation (other than in the capacity of a director) in major policymaking functions of the bank or company, and (ii) the officer does not actually participate therein....

12 C.F.R. § 215.2(d). Petitioners claim that while Dazzio was the chairman of the board of directors, he did not participate in major policymaking by the Bank. In support of their position, they point to the Articles of Incorporation of the Bank which excludes the chairman of the board when it lists the officers of the Bank. They also rely on the fact that the FDIC had never compelled Dazzio to file an executive officer form in connection with Regulation O until after these proceedings were initiated. 12 C.F.R. § 304.5(e) and 349.3(c), Form FFIEC 004.

Petitioners' arguments must fail. First, even if the Bank had resolved that Dazzio was not going to participate in policymaking, Dazzio's actual participation brings him within the definition of "executive officer" under subpart (ii) of § 215.2(d). As the ALJ found in his recommended order:

... [Dazzio] appointed members of the executive committees of the board, and served as [an] *ex officio* member of each committee; as chairman, he conducted most of the board meetings and signed the minutes; he was chairman of the executive loan committee; he brought business into the Bank; he executed employment contracts and other contracts on behalf of the Bank; and he presented loans to the board for approval.

These conclusions were based on Dazzio's own testimony. The Board had substantial evidence before it to conclude that Dazzio occupied a position of substantial policymaking influence at the Bank. His banking activities clearly brought him within the definition of "executive officer" under Regulation O.

**6.** It is undisputed that the Sherwood Meadows Partnership was a related interest of Dazzio within the meaning of Regulation O. 12 C.F.R. § 215.2(k) and (b).

**7.** At the time of the extension of credit, the Bank's total equity capital and reserves was $4.9

million. The Bank's lending limit, the aggregate amount that could lawfully be loaned to any one "insider" borrower and/or his related interests, as to fully secured loans pursuant to 12 C.F.R. § 215.2(f), was 25% of this total or $1,225,000.

Petitioner's argument that the FDIC should have required Dazzio to file an executive officer report fails because the report is not mandatory.[8] 12 C.F.R. § 304.5(e). The FDIC Board properly found that Dazzio as the chairman of the Board, as well as the other officers, should have been aware of the provisions of Regulation O and should have been sophisticated enough to apply them to Dazzio's status.

## V. *The Regulation O "More Than Normal Risk of Repayment" Violation*

Petitioners argue that the FDIC Board incorrectly overruled the ALJ's finding that the FDIC had failed to prove that the purchase of the bonds for the Sherwood Meadows Townhouses had a higher than normal risk of default in repayment or other unfavorable features. The critical statutory provision § 214.5(a) states in relevant part:

> Terms and Creditworthiness. No member bank may extend credit to any of its executive officers, directors, or principal shareholders or to any related interest of that person unless the extension of credit: (1) is made on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank, and (2) does not involve more than the normal risk of repayment or present other unfavorable features.

12 C.F.R. § 214.5(a).

The ALJ found that a § 214.5(a) violation required proof both that the loan involved preferential terms and also an abnormally high risk of default in repayment. Because the ALJ found that this loan was not handled any differently at the Bank than other similar loans, he found that the FDIC could not prevail on this issue as a matter of law. At best, the ALJ concluded that the FDIC proved that the Bank had unsound banking practices, but unsound banking practices was not the test under this section.

■ The FDIC Board made its own contrary interpretation of the statute. We review the interpretation of the FDIC. Our deference is to the agency and not the ALJ. 12 U.S.C. § 1828(j)(4)(D); *Committee for an Independent P-I v. Hearst Corp.*, 704 F.2d 467, 472–73 (9th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 228 (1983). As long as the FDIC's interpretation was rational and consistent with congressional intent, we will uphold it whether we view the ALJ's approach as better or not. *Chevron v. National Resources Defense*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Bangor & A. R. Co. v. I.C.C.*, 574 F.2d 1096, 1110 (1st Cir.), *cert. denied*, 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978).

■ The FDIC Board read the language and structure of the statute to require either a showing of preferential terms, or of more than the normal risk of repayment or other unfavorable features to prove a violation of § 215.4(a). It found no indication in the statute limiting the section to a double requirement as the ALJ had found. We agree. The ALJ misread the conjunctive "and" in the statute. The "and" requires *both* no preferential terms *and* no more than normal risk of repayment. To accept the ALJ and petitioners' interpretation of the provision would protect banks from being charged with a violation of § 215.4(a) even though all their loans involved more than the normal risk of repayment. This result would obviously defeat the intent of the provision.

■ The Board then went on to decide if § 215.4(a)(2) had been violated. The Board's analysis for finding more than the normal risk of repayment or other unfavorable features looks to whether an objective lender at the time the loan was made would have extended the credit based on the available information at that time. We find this interpretation appropriate.

We conclude that the FDIC Board had substantial evidence in the record to find that the officers violated § 214.5(a) of Regulation O under the proper interpretation

---

**8.** If Dazzio and the other officers honestly considered him not to be an executive officer, this fact is relevant to the amount of penalties that should be assessed. The penalties are discussed in section VII of this opinion.

of the section. The Board in its decision relied on the following factors: the lack of documentation as to the loan and also the collateral which was before the officers when they made the decision to fund the loan, the overvaluation of the assets to support the loan, the borrower and the guarantor's potential inability to repay the loan based on the then available financial information, and the interest rate set was 25% less than the prime rate.

The responsible loan officer Jimmy Davis testified that at the time the loan was approved the officers had before them the loan application which he had prepared. It gave preliminary approval to the purchase of the bonds. The officers did not receive until later financial statements or any appraisals as to the collateral. The Board found this lack of documentation an important factor in determining that a violation had occurred.

The Board went on, however, to review the financial statements and appraisals that were eventually received, concluding that they did not support the already approved loan.[9] The Board discounted the $1,780,000 appraisal value on the townhouses because it was improperly based on the sale value of the townhouses as condominiums. The Board rejected the validity of the appraisal because the townhouses had to be kept as rental units for at least ten years to remain qualified for funding from the low-interest tax-free bonds. It follows that the appraisal value was properly adjusted downward by the Board.

As to Dazzio's status, his financial statement gave him and his wife a net worth of $2.2 million, including real estate holdings of $1.4 million and holding company and subsidiary stock worth $847,000. He also reported a CD in the Bank worth $300,000 and $174,000 in escrow.

The Board found his assets on his financial statement overvalued, so it properly discounted his worth. As to his real estate, the Board's main concern was that no independent appraisal of the different properties was made before the funding of the loan by the Bank. The officers seemed merely to accept as valid the figures given. As to Dazzio's shares of stock, most of them were shares of the holding company that owned the Bank. The officers were clearly in a position to know the true value of the stock of the holding company because of its relation to the value of the Bank. The Board concluded that this stock was close to zero in value and that the officers should have been aware of that fact. The Board further discounted Dazzio's overall net worth because of the large number of lawsuits against him. His potential liability was around $4.5 million.

Petitioners argue that even if a violation can be found on the basis of § 215.4(a)(2) and even if the "prudent lender" is the appropriate test to determine if the section applies, the FDIC Board still was in error in finding a violation. Petitioners claim that the Board improperly gave weight to Mrs. Jonnie L. Chapman's and Mr. H. Ronald Hoch's testimony in reaching its conclusion because their opinions that a violation had occurred were based on inaccurate information as to the financial status of the Bank and Dazzio.

Chapman testified as the commissioned bank examiner for the FDIC who reviewed the status of the Bank to determine the risk to the federal deposit fund on January 31, 1986. Petitioners assert that Chapman improperly relied on a handwritten cash flow projection for the project that she claims she found in the Bank's file on the bond purchase. The cash flow projection predicted a $79,000 negative cash flow per year. Petitioners base their assertion on the fact that Davis, the loan officer, testified that the handwriting on the projection was not his and that the projection was on a type of paper that the Bank did not use. If the petitioners' assertion is accepted that this projection was not in the file, the lack of documentation at the time of approval becomes even more troubling. The availability of cash to pay off the loan should have been one of the primary considerations of the officers in approving the loan.

Petitioners also claim that Chapman was unaware of the cash funds that Dazzio had

---

**9.** The appraisal on the townhouses was received August 16, 1985, and Dazzio's financial state-ment was received some time in October before the loan's funding in November.

made available as further collateral to justify the funding. Chapman only testified, however, that she did not verify that amount, not that she did not know of it. Chapman chose rather to focus in her opinion on the predicted negative cash flow per year and on the overvaluation of the collateral at the time the loan was made. The Board properly considered Chapman's testimony on this basis.[10]

The ALJ did not discount Hoch's testimony on the loan repayment potential. The ALJ divided Hoch's testimony into several sections because he testified on several different matters. Hoch was the review examiner of the FDIC Special Situation Section, located in Washington D.C. He based his conclusion on the questionable ability to repay on the reports of the local FDIC examiners who had reviewed the loan. He agreed basically with their reports that the appraisal of the townhouses was overvalued and that the collateral could not support the loan. He, therefore, found that § 215.4(a) had been violated. We see no reason to conclude that this testimony was improperly considered by the Board.[11]

As to the "other unfavorable features" of the bond purchase, the Board found only the reduced interest rate that the Bank was receiving on the purchase of the bonds. While not preferential, the Board found the interest rate unfavorable because the Bank was not able fully to utilize the tax advantage of the bonds because of its lack of

income stream. It would have been better off if it had purchased regular bonds. While the evidence is disputed, we cannot say the Board's finding was in error.

Hindsight is always a possibility in situations such as this. But we find that the Board properly limited its conclusion to the evidence which established the situation at the time the loan was approved.[12] We cannot say that the FDIC Board lacked substantial evidence to find a violation under § 215.4(a) of Regulation O.

## VI. *Due Process Rights*

Petitioners allege that their Fifth Amendment procedural due process rights were violated because they were not informed adequately of the charges against them and because their motion to dismiss or alternatively for a continuance was denied by the ALJ. They urged this motion several times throughout the hearing, basing it upon the FDIC's abuses of the discovery process. Both due process claims must fail.

### A. *Claim of Lack of Notice*

█ Petitioners clearly had the right to notice of the charges against them. *NLRB v. Mackay Radio & Telegraph Co.,* 304 U.S. 333, 350, 58 S.Ct. 904, 912–13, 82 L.Ed. 1381 (1938). There was some confusion within the FDIC as to what the actual charges were.[13] But the FDIC identified clearly in the formal notice of possible pen-

---

**10.** Chapman recommended that the Sherwood Meadows loan be classified as $794,000 substandard and $706,000 loss in her report. She defined a substandard loan as a loan that has well-defined weaknesses that would jeopardize the orderly liquidation of the loan, and a loss loan as a loan that has little to no value. To determine the proper classification, Chapman said that she looked to the repayment ability, collateral, and history of payment.

   While the January 1986 classification of this loan was not determinative of the status of the loan when it was approved, Chapman's testimony was properly considered because she reviewed all the documents that the officers had before them when they made their decision and was able to render an opinion on the appropriateness of funding on this basis.

**11.** The ALJ stated that he gave little weight to the testimony of Hoch with regard to the assessment of penalties because of his reliance on

materials outside the record. More will be said about Hoch's testimony in sections VI and VII of this opinion.

**12.** Petitioners point to the fact that the loan was never in default and the fact that another bank purchased the part of the bond issue that had to be sold because of the overline violation. The FDIC does not dispute that the other bank made a complete review of the loan and found it creditworthy. These facts, however, as well as other facts that were not favorable to petitioners such as the fact that part of the loan was written off by the Bank at the request of the FDIC, are largely irrelevant to the conditions at the time the loan was approved, the relevant time to determine if there had been a violation.

**13.** There was clearly confusion within the ranks of the FDIC whether a violation was also being charged because the loan had preferential terms under § 214.5(a).

alties the two charges the officers were eventually found to have violated. This notice satisfied due process. *See Citizens State Bank v. FDIC,* 751 F.2d 209, 213 (8th Cir.1984) (same standard applies as with civil pleadings).

Even if there were a due process violation here because of the confusion of the charges, petitioners have failed to show the required "substantial prejudice." *Calderon–Ontiveros v. INS,* 809 F.2d 1050, 1052 (5th Cir.1986). They clearly knew of the charges since they fully litigated them at the hearing.

### B. *Abuse of Discovery by the FDIC*

■ Petitioners claim that their due process rights were violated by the ALJ's refusal to dismiss the suit based upon the FDIC's failure to produce certain documents prior to trial and their failure to produce other similar documents at all. These documents, which the FDIC had agreed at a prehearing conference to produce, pertained to how the actual dollar amounts of the penalties for violation were determined.

Petitioners claim that if they had been given Noto 3,[14] before the hearing actually began, they would have subpoenaed the FDIC regional examiners who were mentioned in this report because they had recommended much lower penalties then the FDIC Board's ultimate assessment. They also claim that they were denied an effective cross-examination of the FDIC's witness Hoch because he was excused before they were given the opportunity to question him on certain documents that he had relied upon in his testimony.

While we in no way condone the actions of the FDIC with respect to the discovery abuses, petitioners have failed to show that they have been "substantially prejudiced" by the FDIC's actions or the denial by the ALJ of their motion to dismiss. First, Noto 3 was in evidence. Petitioners had an

opportunity at that time to urge a continuance so that they could subpoena the examiners mentioned, but they chose not to do so. While the motion for a continuance was under advisement throughout the hearing, the judge instructed the petitioners to reraise the motion at the close of the FDIC's presentation of its case if more time was needed to present adequately their defense. FDIC's counsel at all times agreed to allow more time. The petitioners, however, merely presented their case after the successive motions to dismiss were denied, without requesting additional time to subpoena the witnesses they now claim were crucial to their case. *See Potomac Electric Power Co. v. ICC,* 744 F.2d 185, 192 (D.C.Cir.1984).

Further, they have failed to show how the testimony from the regional examiners would have been anything other than duplicative of evidence already in the record. The ALJ and the FDIC Board had the lower recommended penalties before them when they made their decisions. Thus, the fact that the information was entered into the record late does not amount to substantial prejudice requiring reversal.[15]

As to the documents relied on by Hoch in his testimony, his handwritten notes as to how he formulated the amount of penalty were shown to petitioners' counsel. While petitioners did not have the opportunity to cross examine him as to his notes, they had been given the opportunity to cross examine him on how he reached his penalty dollar figures. They do not allege any variance between his notes and his testimony. They have failed to show substantial prejudice in failing to have the opportunity to cross examine him with respect to his notes.

Other documents Hoch relied upon were never produced. They concerned how the FDIC examiners had figured their own recommendations as to the dollar amounts of civil penalties against petitioners.[16] This

---

**14.** The document they eventually received during the second day of the hearing.

**15.** The FDIC's failure to carry out its promise to produce the documents without delay, with Noto 2 and 3 finally being supplied two days before trial and on the second day of trial, was clearly an abuse of discovery. That abuse

might be appropriate grounds for some form of sanctions. In this appeal, however, we are empowered only to determine the issue of prejudice from the asserted due process violation.

**16.** Hoch testified that his recommended amount of penalty took into account a desire on the part of the FDIC to have consistent dollar amounts

evidence was probably protected under the government deliberative process privilege. *See Green v. IRS*, 556 F.Supp. 79, 84–85 (N.D.Ind.1982), aff'd, 734 F.2d 18 (7th Cir. 1984).[17]

Further, petitioners again fail to show prejudice because the Board did not rely on Hoch's recommendations on this issue. The FDIC Board made its own determination of the proper penalties it deemed appropriate based upon its own analysis of the information.[18]

## VII. *The Amount of Civil Money Penalties*

Section 2[18](j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1828(j)(4)(A), authorizes civil money penalties for violations of the insider lending provisions:

> Any nonmember insured bank which violates or any officer, director, employee, agent, or other person participating in the conduct of the affairs of such nonmember insured bank who violates ... 375b of this title, or any lawful regulation issued pursuant thereto, ... shall forfeit and pay a civil penalty of not more than $1000 per day for each day during which such violation continues....

The maximum fine under this section that could have been assessed against the Petitioners for the two violations was found to be $511,000 by the Board. This figure is not disputed by the petitioners.[19]

To determine the actual assessment that is appropriate within this maximum limit, § 1828(j)(4)(B) provides:

> In determining the amount of the penalty the Corporation shall take into account the appropriateness of the penalty with respect to the size of financial resources and good faith of the member bank or person charged, the gravity of the violation, the history of previous violations, and such other matters as justice may require.

12 U.S.C. § 1828(j)(4)(B).

### A. *Amount Assessed Against Dazzio*

■ The Board imposed a penalty of $125,000 against Dazzio. The Board found that Dazzio netted over $175,000 by financing the transaction through the Bank. It based the calculation of $175,000 on the lower interest rate that the bonds made possible compared with the interest rates on similar outright loans for this type of project. The Board also took into account the rents that the partnership had received on the Sherwood Meadows Townhouses and the payment of the ad-valorem taxes by the bond trustee. In arriving at its $175,000 figure, the Board subtracted from this aggregate of benefits the expenses that had been incurred on the townhouses. It then lowered this figure to $125,000 based on the honesty and good faith of Dazzio. We do not conclude that the amount of this penalty constitutes an abuse of discretion. But we must find that the

---

throughout the country for violations of Regulation O. He admitted that he relied on two other cases before the FDIC where penalties similar to those he recommended were assessed. The ALJ correctly discounted Hoch's testimony concerning the penalties he recommended to the Board because it was not based on evidence in the record.

**17.** Any documents that were actually turned over to opposing counsel lost the protection of the privilege, but the documents not turned over were still protected even if counsel for the FDIC agreed to turn them over at the pretrial conference unless they related to the same subject matter as ones already disclosed. *C.F. SCM Corp. v. United States*, 473 F.Supp. 791, 797–99 (CCPA 1979) (the executive privilege not lightly waived). As to the handwritten documents used to refresh Hoch's memory, any privilege was clearly waived. *Marshall v. United States Postal*

*Service*, 88 F.R.D. 348, 350 (D.C.D.C.1980). Of course, the FDIC was still subject to sanctions for refusing to disclose any privileged materials in the *in camera* proceeding.

**18.** Hoch's proposed assessment of penalty was based on the $271,000 charge off by the Bank as to the Sherwood Meadows Loan in June of 1986. In figuring the proper penalty, the FDIC Board instead looked to the financial benefit Dazzio received.

**19.** Whether a penalty should be assessed at all is determined by 13 factors. Interagency Policy Regarding the Assessment of Civil Money Penalties by the Federal Financial Regulatory Agencies, 45 Fed.Reg. 59423, September 9, 1980, effective August 28, 1980. The record established that the FDIC analyzed these factors in its determination that penalties should be assessed. See footnote 2.

Board in its assessment did not deal adequately with the statutory factor of ability to pay. It based its conclusion on this factor on an out-of-date financial statement without properly either considering or explaining why it found unpersuasive the more current information in the record.

The Board in determining Dazzio's ability to pay used Dazzio's 1986 financial statement which gave Dazzio a net worth of $901,000. The Board used the 1986 statement because it held that it was Dazzio's responsibility to produce the most current financial data available and the Board decided that he had not done so. What the Board overlooked was the fact that Dazzio testified in detail as to his current ability to pay. So, that information was in the record. No later tax returns were in the record, for example, because he had not filed an income tax return since 1985 because of all the financial problems he was having. The ALJ in finding a present inability to pay summarized the relevant evidence as follows:

> ... [Dazzio's] most recent financial statement, one dated September 9, 1986, shows a net worth of $901,000. Since that time, his residence in Baton Rouge has been given up in foreclosure proceedings, a Mercedes automobile has been given up in payment of a bank loan, a $14,000 life insurance policy has been cashed, other real estate has been given up to creditors or is the subject of current litigation and has no apparent value, and a residential condominium in Florida has little or no equity.

Thus, the Board seemingly ignored the evidence in the record which supported the ALJ's findings as to the current information when it found that Dazzio had the ability to pay a "substantial" penalty. It focused upon the following facts:

> ... Dazzio testified at the hearing that in 1987 he received $2,700 per month in rental income; that he purchased a home in Florida on the basis of a credit report without having to provide a financial statement or a statement of earnings; that he borrowed $177,000 from a savings and loan association, paid $115,000 in cash to the seller of the house and

gave a second mortgage on his condominium in Alabama as security ... [and the fact he] is optimistic about his future prospects in Florida.

It seems to have credited part of Dazzio's testimony without making any careful findings evaluating the testimony as a whole.

We further find the use of the 1986 financial statements possibly inappropriate in light of the Board's other use of them. The FDIC Board discounted Dazzio's financial statements for purposes of finding a Regulation O violation, but gave them face value for purposes of the assessment of a fine. The Board's harsh stance with Dazzio coupled with the Board's lenience with the FDIC's counsel in its failure to produce requested documents further sheds light on the possible arbitrariness and inconsistency of its decision. *See Shell Oil Co. v. Federal Energy Regulatory Com'n,* 664 F.2d 79, 83 (5th Cir.1981) (court found FERC's actions arbitrary and capricious because FERC was taking an inconsistent position).

All of these considerations lead to the necessity of a remand to the Board of the Dazzio penalty for further consideration and findings on the record. On remand, the Board is directed to develop detailed findings that evince a thorough evaluation of all factors which under the statute must enter into the penalty which the Board assesses upon its reconsideration.

## B. *The Other Officers*

█ As to the other officers, the Board accepted the majority of the ALJ's findings but increased the amount of the relatively small penalty from $1000 to $3000. The Board agreed the officers acted in good faith without dishonesty. The Board also found no economic benefit from the purchase of the bonds. The Board, however, found a need for a deterrent effect stating that the "assessed penalty ... is assessed primarily for its deterrent effect." We do not find the increased fines an abuse of the Board's discretion.

The Board based the need to deter on the following findings: that there were two violations although the ALJ erroneously determined that there was only one, the violations were continuing in their nature, the loan had a significant impact upon the

condition of the Bank, and finally, a focus upon the potential penalty.

## VIII. *Conclusion*

We find that there is substantial evidence on the record as a whole to uphold the FDIC Board's finding that the officers violated both § 214.5(a) and (c) of Regulation O. As to § 214.5(c), it is clear from the record that Dazzio was an "executive officer" so that the bank was "overline" with regard to the Sherwood Meadows Townhouses loan. As to § 214.5(a), there was substantial evidence to find that the loan involved more than the normal risk of default in repayment and other unfavorable features.

As to the due process violations alleged by petitioners, they had proper notice of the charges against them and fully litigated them. As to the discovery abuses by the FDIC, they have failed to show "substantial prejudice."

The Board correctly found that the officers had violated two provisions under Regulation O. We thus uphold the $3000 penalty assessed against the officers other than Dazzio. As to Dazzio, we remand for the Board to reconsider the proper amount of penalty and findings to support its conclusion.

**REVERSED AND REMANDED.**